CONGER *et al. v.* WEAVER *et al.*

The right to be protected in the possession of the public lands in this State, is founded alone on the doctrine of presumption; for a license to occupy, from the owner, will be presumed.

The Government of the United States, in the face of the notorious occupation of the public lands in this State by her citizens, that upon those lands they have mined for gold, constructed canals, built saw-mills, cultivated farms, and practiced every mode of industry, has asserted no right of ownership to any of the mineral lands in this State.

The State Government has not only acquiesced in this universal appropriation of the public lands for all these purposes, but has studiously encouraged them, in some instances, and recognized them in all; and this Court has held that the State, in her legislation on the subject, has established the policy of permitting all who wish, to work the mines, with or without conditions.

Yet this permission has not been derived from express legislation, but by general legislation, looking at the general state of things, from which a license is necessarily presumed to all who choose to avail themselves of it.

Among the other pursuits thus encouraged, and which have been referred to in legislative acts and been made the subjects of revenue, is the construction of ditches, canals and flumes, for the purpose of conducting water for mining purposes.

This right, then, like digging gold, is a franchise, and the attending circumstances raise the presumption of a general grant from the sovereign, of this privilege; and every one who wishes to attain it has license from the State to do so, provided that the prior rights of others are not infringed upon.

As, from the nature of these works, time is necessary to complete them, the license would be valueless, if the right did not commence until their completion; and it must be presumed that, in granting the license, the State did not intend it should be turned into so vain a thing, but designed it to be effectual, for the object in view; and it consequently follows that the same rule must be applied here to protect this right as any other.

In constructing canals, under the license of the State, the survey of the ground, planting stakes along the line, giving public notice, and actually commencing and diligently pursuing the work, is as much possession as the nature of the subject will admit, and forms a series of acts of ownership which must be conclusive of the right.

The enclosure of the ground used in digging a canal, not being necessary for the work, would give its proprietors no higher rights; nor is it necessary, as notice, to those who have received actual notice, of the intended line of the canal.

Where the owners of a ditch had commenced their ditch and run their line before the location and appropriation of a lot of land by the plaintiffs, who sued them for trespass thereon; *Held* that a slight divergence in the construction of the canal from the original line, after the plaintiffs' location and appropriation—both lines running equally through the plaintiffs' claim—was no trespass in constructing the ditch on the new line; and, if the plaintiffs' suffered no actual injury by the change, it was *damnum absque injuria.*

APPEAL from the District Court of the Fourteenth Judicial District, County of Sierra.

This was an action of trespass, *quare clausum fregit,* instituted by plaintiffs to recover damages for injuries committed by defendants in a certain close of plaintiffs, used as a saw-mill yard, situated on the south branch of the Middle Fork of the Yuba River, in Sierra county. There is a prayer for an injunction contained in the complaint—which, however, is not considered in the appeal.

The answer of the defendants denies the trespass, and justifies under a claim of right of way across the close in question, for the construction

Conger *v.* Weaver.

of a flume or ditch for the purpose of diverting the waters of the stream, on which the plaintiffs' mill is situated, for mining purposes. It is admitted that the title to the land occupied by plaintiffs' close and by defendants' flume and ditch, is in the Government.

It appears, from the statement of the evidence, that the plaintiffs, in March, 1855, surveyed their mill-yard and ditch for the mill, and located a point on the stream for the construction of a mill-dam. The mill was completed in July, 1855. In November, 1855, the defendants removed saw-logs, belonging to plaintiffs, from their close, and proceeded to construct a large flume across the same, which constitutes the trespass laid in the complaint.

The defendants proved that they commenced the survey of their ditch in July, 1853, beginning at the lower end; and ran a primary survey along the line a distance of about twelve miles, planting stakes every four rods—since which time they had actively prosecuted the work, and expended a large sum of money thereon. The defendants proved that long before the location and construction of plaintiffs' premises, their line was staked out across the plaintiffs' close, and within nine feet of where the flume was actually laid, in November, 1855, and that their notices were conspicuously posted; and further, that the plaintiffs had actual notice thereof while they were erecting their saw-mill. There was some testimony introduced by plaintiffs, to the effect that when they commenced to erect their mill there was no line surveyed for defendants' ditch across the plaintiffs' close.

It was shown that the plaintiffs' mill is situated on the side of a hill, and that they procured their saw-logs from the hill above; that the flume of defendants ran above the mill, and prevented plaintiffs from getting their logs to the mill. There was also some testimony introduced by plaintiffs, to the effect that the first line of survey of defendants' ditch would have carried the flume below the plaintiffs' mill; but the distance in altitude between the bottom of defendants' flume and the bottom of plaintiffs' mill-wheel is proved to be twenty-five and a half feet; while the difference between the old and and the new grade of the flume, at the mill, is proved to be only ten, or at most sixteen feet, the flume being above the first line of survey. The alteration in the grade or survey was proved to have been made in July, 1855.

On this point the Court below instructed the jury that the defendants had no right to change the line of their ditch, provided such change would work an injury to the plaintiffs. The instructions refused and those given are quite numerous; the substance of the ruling of the Court below being that, if the defendants had located their ditch across the close of plaintiffs, prior to plaintiffs' possession, and had posted notices along the route thereof, and had proceeded since, actively, to prosecute the work, they were entitled to a verdict.

The jury, under the instructions of the Court, found a verdict for the defendants, and judgment was entered accordingly. Motion for a new trial was made and overruled, and plaintiffs appealed.

*McConnell* for Appellants.

Inasmuch as plaintiffs' possession was established by uncontradicted proof and is in point of fact not disputed, the turning point of this case must be as to the existence of such right of way.

It would seem from defendants' answer, although there was no proof on that point, that the fee of the land occupied by both parties is in the Government.

We would in the outset of the argument, call the particular attention of the Court to the nature of defendants' defence and the character of the proof by which they attempt to support it.

In their answer to the original and amended complaints they set up that they claimed and owned a right of way over said close for the purpose of constructing a flume or canal. A "right of way" is an easement, and an easement is defined to be a "privilege which the public, or the owner of neighboring lands or tenements hath in the lands of another." 3 Kent's Com., 419. A right of way is defined to be "a right of private passage over another man's ground." 3 Kent's Com., p. 419, 420.

We will pause here to suggest, that inasmuch as a right of way is an easement in the land of another, a plea justifying on that ground necessarily admits title and possession in the plaintiffs. This clearly follows from the language of the definitions given. The defendants, therefore, for all the purposes of this appeal, are estopped by their plea from denying plaintiffs' title or possession. 10 Conn. R., p. 23.

To return to the definitions of Mr. Chancellor Kent, of an easement and "right of way." We say, first, that a right of way is not and cannot be, property in the land itself, or flowing out of it, but a mere abstract right created by the relation which their respective estates bear to each other. Secondly, a right of way properly so called, is inconsistent with the possession of the land over which the way passes, for when the right and the possession vest in the same individual, the right merges into the possession.

From this, it follows, first, that a right of way can never be exclusive as against the owner of the land, for if it could, then the title to the land itself would be in the owner of the right of way or easement, a conclusion altogether inconsistent with the definitions before cited. The reverse of this proposition would involve the obvious logical absurdity, that a man could have an easement in his own property.

Secondly, that the owner of a right of way cannot obstruct the way or use it in a manner to do injury to the land through which it passes. This obvious principle is the foundation of the well known rule of law, viz.: that a person having a right of way over the land of another, must confine himself strictly to the way or road which he has the right to pass, and the least departure therefrom, will be a trespass. Hence we say, that the right to build a flume or dig a ditch over the land of another, can, in no proper sense of the words, be called a right of way.

A flume or ditch is necessarily a permanent structure, and I lay it down as almost an axiom, that he who has a right to encumber lands

Conger *v.* Weaver.

with permanent buildings of any kind must also have either the *jus proprietatis* or the *jus possessionis* in such lands.

It is scarcely necessary to cite authorities in substantiation of this proposition, but I will refer to a few elementary rules. It is said by all law writers that a grant to one and his heirs (in this State the word heirs would be superfluous,) of the profit of a particular piece of land will pass the land, because, says one, "what is the land but the profits thereof, for thereby vesture, herbage, trees, mines, and all whatsoever parcel of that land, doth pass." A grant of the annual growth on land (*vesturam terræ*) will pass such an interest and possession in the land itself, as to enable the grantee to maintain trespass *quare clausum fregit.* 2 Wheaton's Selwin, p. 1341 and cases cited; Coke on Litt., 5a, 15b. Now we say that a right to occupy land *in perpetuum* in any manner whatsoever, is an interest or property in the land itself, as contradistinguished from a right or easement flowing out of the land.

The Court cannot but perceive the point we desire to make, but to remove even fancied difficulties, I will re-state our propositions.

1. A "right of way" is not an interest or right in the land itself.

2. A "right of way" is a mere right of passage, and does not and cannot include the right to permanently occupy.

3. If defendants have in fact, as they say they have, a right to encumber plaintiffs' close by a permanent structure, they must also have a property conjoined to the physical possession of the land itself.

These conclusions involve the further conclusion that defendants have failed to describe properly the nature of the right claimed by them, and I presume we might with safety stop and rest the case on this point.

If defendants' right to construct a flume across plaintiffs' close also involves within itself a right to the close, or to the possession of the close, the next inquiry will be whether they, in point of fact, had either the possession or a right to the possession.

If they had the right to the possession, it must have resulted from acts of a fixed and definite character which are susceptible of ready proof.

To constitute possession of a lot of land dedicated to the purpose of digging a ditch or building a flume, the same acts are necessary as constitute possession of a ranch or town lot.

I certainly know of no principle, which in its practical operation would go to relax fixed rules of law in favor of the owners of ditches, or any other class of the community. I am aware of the great prevalence of an opinion among the unlearned, that judicial decisions must, as far as possible, be made to conform to the wants and exigencies of a new community.

They say that mines and water ditches are things *sui generis*, and that our Courts, disregarding settled principles and analogies, should frame their decisions so as to make them subserve the fancied interest of a supposed majority.

We deny altogether the proposition that a Court has the right to pry nto the wants of the people and ascertain as the basis of its decison what the interest of the majority requires.

The only inquiry then, remaining in this connection is, what acts are necessary to constitute a right to the possession of a portion of the public land? And here, fortunately, we are not driven to an investigation of abstract or fundamental principles, but can rest our case on a plain, distinct, and well settled rule, laid down by our own Supreme Court.

In the case of Sweetland v. Froe and others, decided by this Court at its April Term, 1856, this very question arose, and after full argument was decided.

Here, then, we say, is a plain and distinct rule for the government of this case. The plaintiffs were in actual possession, *possessio pedis*, of the mill-yard at the time of defendants' entry, because they had it actually covered with their saw-logs.

The defendants, to justify their entry, must establish a paramount right of possession, which could only exist provided they had at some time an actual prior possession.

The land belonging (according to defendants' own showing,) to the public, it is requisite to constitute the possession out of which the right of possession flowed, that defendants should have actually enclosed the ground on which they expected to construct their flume, prior to the occupation of the same by the plaintiffs.

It is not pretended that defendants at any time had enclosed any piece of ground between the gap and the river, much less the close of the plaintiffs. Nor is there a particle of evidence to show that defendants ever had a stake on the ground occupied by the plaintiffs as a mill-yard. Now then, under the decision in Sweetland v. Froe and others, is it not established conclusively, that defendants never had a possession of the close, and as a consequence that they never had a right to the possession, for it is manifest that having no title or color of title, they could only have a right of possession by having been once in the actual possession.

The object of requiring a settler on Government land to inclose his land in order to get a defeasible possession, is to give notice to the world of the extent and boundaries of his claim.

The object of requiring a projector of a ditch to mark out in any way the line or course of his intended ditch is also to give notice to the world of his claim to the same. Now in the one case, a marked boundary of stakes and blazed trees, the result of a regular survey, was deemed insufficient to give that notice ; while in this case it is claimed that a mere "random" survey or reconnoisance with no stakes of importance along the route, is sufficient.

But the defendants predicate their claim upon, and connect it with, an alleged prior right to divert and use the waters of the Middle Yuba.

Whether this question of the water right could properly arise in this case, I will not now stop to discuss. My impression is that it could not, for it certainly does not follow that because defendants had a prior right to the water of the Yuba, they therefore had the right to pass with their flume through plaintiffs' close.

The question has however been thrown into this case and we are

perfectly willing to meet it.  It is in proof and not contradicted, that plaintiffs had actually diverted the water of the Middle Yuba, and were using it to propel their saw-mill in the month of July, 1855.

The defendants had not built their flume, even, before the month of November, 1855, and there is no evidence that they ever, at any time, actually diverted the water or used it.

In the case of Kelly v. the Natoma Water Co., this Court in a well considered, though brief opinion, held, that the right to water for the purpose of diversion on the public land, must date from the actual appropriation of the water, by the party claiming it.  In the same opinion they refer to the case of Barne v. Stark, 4 Cal. R., 412, and commend the doctrine of relation there laid down.  This portion of the opinion has given rise to what I consider a misconception of its true purport and meaning.

For if the doctrine of relation applies at all, it must be to such acts only as have direct and immediate connection with the act of appropriation, and not such as remotely superinduce thereto.  The acts necessary for the appropriation of water by diversion, are few and simple, they are, 1st—the construction of a dam to the river; and 2d, the digging of a ditch or building of a flume to receive the water.

But a party, starting at a great distance from a stream and running not to a fixed and definite point, but to the stream generally, cannot, with any degree of propriety, be said to be doing one of the series of acts necessary to constitute an appropriation.

Now we say, that no property in one of the elements, can exist separate from its use; as long as a party has no control or dominion over it, he has no property in it.  The very adjective "usufructuary," adopted to characterize the sort of property which may be had in water, proves this.

In this State, however, the diversion of a water-course is admitted to be legal as against persons claiming by a naked settlement on the public lands.  Irwin v. Philips, 5 Cal. R.

The theory of that decision is that a person has the right to divert a water-course, provided he is prior in point of time, as against another person who has only a naked possession of the bed or banks of the stream, because such person having no title cannot object to the diversion; in other words that no one can object to the diversion of water, who has not either a title to the soil or a prior possession.  This decision is not, and does not purport to be, a departure from the common law.

To acquire a right to divert water among riparian owners, where it does not depend upon an actual grant, two things are essential.  First, that the party should actually divert and have the control and use of the water, and secondly, that such control and use should continue without interruption or molestation, for the space of time limited by prescription, which of course must vary in different countries.

The decision that priority confers right, arose from the application of settled principles to a new and extraordinary state of facts—the decision

that it was not requisite to confer a water right for the party to have the actual control and use of the water, would be a perversion of a principle equally applicable here, as elsewhere.

The principle that the right and the use are inseparable and mutually dependant, is not confined to water, but extends to all the elements alike. Thus, a man can acquire a certain degree of property in air or light which a court of law will protect. But all authors agree that, in either case, it is the use and control that confers the right.

The testimony of all of defendants' witnesses establishes, that wherever their original survey or location might have run, it certainly did not cross plaintiffs' close at the points where they afterwards committed the alleged trespass.

If plaintiffs obtained possession of the *locus in quo,* subject to any right of way in defendants, it was the way, as it then existed, not such as it might become by the whim or caprice of defendants. 2 Wheaton, Selwin's Nisi Prius, p. 1368, and authorities there cited.

If the acts of defendants are unlawful, then the law infers an injury to plaintiffs.

The injury, in point of fact, may be nothing, yet if the defendant is guilty of an unlawful act on the premises, the plaintiffs are entitled to a verdict. This is the principle of that large class of cases, where nominal damages are recovered. Indeed, the action of ejectment, was in its origin an action of trespass, brought to try the title, wherein the damages were of course, purely nominal.

Suppose a jury in an action of trespass should find specially, that defendant had unlawfully entered upon plaintiffs' close, but had done no ascertainable injury, would not a Court disregard the last portion of the finding, and either render judgment for plaintiff or award a *venire de novo.* It certainly would not enter judgment for defendant in such a case.

And if we follow this doctrine to its legitimate conclusion, I suppose they could run through my house or barn, built after the year 1853, for my possession of the ground on which my house stands, is not more sacred than my possession of a field or other piece of land. The doctrine goes even further, and in effect gives to a ditch proprietor the power, by changing his ditch route, to pass through all lands occupied subsequent to his appropriation. The State of California, with all its power, cannot do what the Court said these defendants could do.

*Dunn & Meredith* for Respondents.

That if any error existed and was made by the Court during the progress and examination of the case and in the final judgment had in the rulings of the Court, and giving and refusing instructions, it was adverse to, and against the respondents, and in favor of appellants, and about which they have no right to complain. (See instructions of the Court.) And we refer, in support of this position, to the case of Eddy *et al. v.* Simpson *et al.,* 3 Cal. Rep., 249; Irwin *v.* Philips, 5 Cal. Rep.; Kelly

*v.* Natoma Water Co., Cal. Rep., Jan. Term, 1856; and Priest *et al. v.* Union Water Co., Cal. Rep., April Term, 1856.

Weaver & Co. were first to locate and take up the waters of the South Fork of the Middle Fork of the Yuba River, and did locate the same, and commence work upon the same, and did run a grade line which they afterwards followed, long anterior to the time plaintiffs went upon the ground.

Saw-logs lying upon ground is not an enclosure, and all law writers upon the subject deny it to be so. See Law Dic., p. —.

This Court has said it will notice the peculiar condition of the country; if so, could it be so unreasonable as to ask, as the appellants have done, that the respondents should have been compelled to run a serpentine fence or enclosure along thirty miles of flume to give them right; if so, every ditch in the country is gone to the first who may choose to intervene. Irwin *v.* Philips *et al.*, Cal. R., p. 21, January Term, 1855.

Weaver & Co. being the first to locate, if they commenced in good faith to appropriate, had a right of way along their ditch wherever it might run; they did not alter their grade, but had a right to do so, and if in so doing, they passed through the public lands afterwards claimed by others, they had a perfect right so to do. Although the proof shows no change of grade from the original grade line run by the respondents in 1853, yet they had a right to run or change it. Waldron & Joiner *v.* Marsh *et al.*, Cal. R., Jan. Term, 1856.

Random survey, as assigned in error by appellants, according to all the testimony, means a first or preliminary survey. If right, as was found to be so in this case, it is adopted; if wrong, then it might be changed in accordance with intention of appropriation.

The proof shows that from first to last, plaintiffs knew they were claiming and endeavoring to appropriate a right claimed and appropriated by respondents. They were warned and willfully blind.

The whole testimony and cases show that the jury were properly instructed, and passed upon the facts as they had a right to do. This Court will not disturb their verdict. Almaberry *et al. v.* Dickhouse *et al.*, 4 Cal. R., 102.

Mr. Justice HEYDENFELDT delivered the opinion of the Court. Mr. Justice TERRY concurred. Mr. Chief Justice MURRAY dissented.

It is admitted in the argument, on both sides, that the rights claimed by both parties are in and to the public lands, neither of them having title, except what arises from possession, or the claim of it.

In the decisions we have heretofore made upon the subject of private rights to the public domain, we have applied simply the rules of the common law. We have found that its principles have abundantly sufficed for the determination of all disputes which have come before us; and we claim that we have neither modified its rules, nor have we attempted to legislate upon any pretended ground of their insufficiency.

That new conditions and new facts may produce the novel application

of a rule which has not been before applied, in like manner, does not make it any less the common law; for the latter is a system of grand principles, founded upon the mature and perfected reason of centuries. It would have but little claim to the admiration to which it is entitled, if it failed to adapt itself to any condition, however new, which may arise; and it would be singularly lame if it is impotent to determine the right of any dispute whatsoever. Having, as far as we have gone, met all difficulties by adhering to its doctrines, we have no ground to presume that we will have to go beyonds its precincts for a solution of any which may arise.

One of the favorite and much indulged doctrines of the common law, is the doctrine of presumption. Thus, for the purpose of settling men's differences, a presumption is often indulged, where the fact presumed cannot have existed. In support of this position, I will refer to a few eminent authorities.

In Eldridge v. Knott, Cowper, 215, Lord Mansfield says: "Lord Coke says, somewhere, that an Act of Parliament may be presumed, and of late it has been held that even in the case of the crown, which is not bound by the statutes, a grant may be presumed from great length of possession. It was so done in the case of the corporation of Hull & Horner; not that, in such cases, the Court really thinks such a grant has been made, because it is not probable a grant should have existed without its being on record, but they presume the fact for the purpose, and from a principle, of quieting the possession."

See, also, Goodtitle v. Parker, 11 East., and Granger v. Scott, 6 Man.

In these cases, presumptions were indulged against the truth—presumptions of Acts of Parliament and grants from the crown. It is true, the basis of the presumption was length of time, but the reason of it was to settle the dispute and to quiet the possession. If, then, lapse of time requires a Court to raise presumptions, other circumstances, which are equally potent and persuasive, must have the like effect for the purposes of the desired end; for lapse of time is but a circumstance, or fact, which calls out the principle, and is not the principle in itself.

Every judge is bound to know the history and the leading traits which enter into the history of the country where he presides. This we have held before, and it also is an admitted doctrine of the common law. We must, therefore, know that this State has a large territory; that upon its acquisition by the United States, from the sparseness of its population, but a small comparative proportion of its land had been granted to private individuals; that the great bulk of it was land of the Government; that but little, as yet, has been acquired by individuals by purchase; that our citizens have gone upon the public lands continuously, from a period anterior to the organization of the State Government to the present time; upon these lands they have dug for gold; excavated mineral rock; constructed ditches, flumes and canals for conducting water; built mills for sawing lumber and grinding corn; established farms for cultivating the earth; made settlements for the grazing

of cattle; laid off towns and villages; felled trees; diverted water courses; and, indeed, have done, in the various enterprises of life, all that is usual and necessary in a high condition of civilized development, All of these are open and notorious facts, charging with notice of them not only the Courts who have to apply the law in reference to them, but also the Government of the United States, which claims to be the proprietor of these lands; and the Government of the State, within whose sovereign jurisdiction they exist.

In the face of these notorious facts, the Government of the United States has not attempted to assert any right of ownership to any of the large body of lands within the mineral region of the State.

The State Government has not only looked on quiescently upon this universal appropriation of the public domain for all of these purposes, but has studiously encouraged them, in some instances, and recognized them in all.

Now, can it be said, with any propriety of reason or common sense, that the parties to these acts have acquired no rights? If they have acquired rights, these rights rest upon the doctrine of presumption of a grant of right, arising either from the tacit assent of the sovereign, or from expressions of her will in the course of her general legislation, and, indeed, from both.

Possession gives title only by presumption; then, when the possession is shown to be of public land, why may not any one oust the possessor? Why can the latter protect his possession? Only upon the doctrine of presumption, for a license to occupy from the owner will be presumed.

In the case of Hicks *v.* Bell, 3 Cal. R., speaking of this State's ownership of her gold mines, this Court said: "In her legislation upon this subject, she has established the policy of permitting all who desire it to work her mines of gold and silver, with or without conditions."

Yet there was not at that time, nor has there been since, any act of the Legislature directly conferring the privilege of working the mines, except in cases of foreigners, who were required to obtain and pay for a license to do so.

How, then, was the permission derived? The answer is evident. Her general legislation, looking at the existence of this state of things, and referring to it, necessarily presumed a license—a license to every one who chose to possess himself of the franchise.

Now, also, ever since the organization of the State, among the other various enterprises which have been undertaken upon the public lands, is that which is brought in question in the case before us—the construction of ditches, flumes, and canals, for the purpose of conducting waters from their natural channels to supply the wants of gold miners.

In like manner, as in other pursuits, the State Government has looked on the progress of these works for the past seven years, until their extent has reached hundreds of miles, and every important stream in the State has been tapped by them—has referred to them in various

36

legislative acts, and has annually made them the subject of revenue to the State.

In Irwin *v.* Philips, 5 Cal. R., we canvassed the action and non-action of the State upon this subject, and derived from her course by the rule of presumption, a positive right in the constructors and owners of these works to hold and enjoy them as property—a vested right which cannot be taken away.

In that and several subsequent cases we have recognized their right to appropriate the water, to divert it from its natural channel, where no riparian rights intervened, and to be protected in its use, in its pure and natural condition, against all subsequent efforts to divert or injure it.

This right, then, like that of digging gold, is a franchise; the attending circumstances raise the presumption of a general grant from the sovereign of this privilege, and every one who wishes to attain it has license from the State to do so, provided the prior rights of others are not interrupted.

But, from the nature of these works, it is evident that it requires time to complete them, and from their extent, in some instances, it would require much time; and the question now arises at what point of time does the right commence, so as to protect the undertaker from the subsequent settlements or enterprises of other persons. If it does not commence until the canal is completed, then the license is value-less, for after nearly the whole work has been done, any one, actuated by malice or self-interest, may prevent its accomplishment; any small squatter settlement might effectually destroy it.

But I apprehend that, in granting the license which we have presumed for the purpose before us, the State did not intend that it should be turned into so vain a thing, but designed that it should be effectual for the object in view; and it consequently follows that the same rule must be applied here to protect this right as in any other.

Possession and acts of ownership are the usual indications of a right of property, and these must be judged according to the nature of the subject matter.

One is in possession of an empty house who has the key of its door in his pocket; of a horse, when he is riding it; of cattle pasturing upon his grounds; so a miner, who has a few square feet for his mining claim which he cannot directly occupy, has possession, because he works it, or because he has staked it off to work it, if his acts show no intention to abandon; building a dam, is taking possession of water as a usufruct.

So, in the case of constructing canals, under the license from the State, the survey of the ground, planting stakes along the line, and actually commencing and diligently pursuing the work, is as much possession as the nature of the subject will admit, and forms a series of acts of ownership which must be conclusive of the right.

It is true, as is contended by the appellants, the defendants might have enclosed the ground which they needed for the digging of their

canal; but enclosure was not necessary for the work, it would give them no higher rights, and it would have been no more notice than the plaintiffs already had received. *Lex non cogit ad vana* is another maxim of the common law.

But it is urged that in completing the canal or flume in question, the defendants diverged a little from their original surveyed line, at the point where it passed through the lot claimed by the plaintiffs, and that, therefore, this was an injury for which they were at least entitled to nominal damages. This position is not correct. Either line passed through the same lot. The defendants had the right to go upon the lot and erect their flume through it; there was, therefore, no trespass, and if the divergence was no actual injury to the plaintiffs, it was *damnum absque injuria,* and the Court below properly instructed the jury on that point.

There are other assignments of error, but these we have already considered are conclusive of the merits of the case; and the others, even if well assigned, can have no effect in changing the result.

Judgment affirmed.

MR. CHIEF JUSTICE MURRAY—I dissent.