## THE GOLD HILL QUARTZ MINING COMPANY, APPELLANT, *v.* JACOB ISH, RESPONDENT.

EMINENT DOMAIN.—Mines of precious metals belong to the eminent domain of the political sovereignty.

OCCUPANCY—RIGHT OF, RECOGNIZED.—By the act of Congress of July 26, 1866, the General Government extended to all in possession of mining claims, and all subsequently locating and denouncing mines containing the precious metals, a guarantee of protection in their occupancy so long as the mines are operated.

PRE-EMPTION.—The provisions relative to pre-emption of mining lands in said act, and the amendments thereto, are not obligatory.

PATENT TO MINERAL LANDS.—A patent for agricultural lands does not pass title to known deposits of precious metals.

EFFECT OF FAILURE TO SEGREGATE MINERAL LANDS.—Failure of government surveyors to segregate mineral from agricultural lands cannot operate to defeat the rights of occupant miners.

APPEAL from Jackson County.

This suit was instituted to quiet the title to and enjoin the respondent from asserting any rights in and to a certain gold-bearing quartz lode situate in Jackson County.

The complaint alleges that Henry Klippel, John McLaughlin, Charles S. Drew, N. C. Dean, Thomas Chavner and John E. Ross, on December 5, 1865, located six claims upon the said lode in accordance with the provisions of the State laws and the local laws and customs of miners. On December 11, 1865, the said parties filed articles of incorporation under the general laws of the State. The name of the incorporation was declared to be "The Gold Hill Quartz Mining Company;" the capital stock was fixed at $60,000, and the object was the working of the said lode. The company was duly organized, the stock-books opened, and the stock subscribed. Contemporaneous with the filing of the said articles of incorporation the parties aforesaid duly transferred their claims to the said company. Ever since said transfer, and up to July 8, 1871, the said company were in possession of said claims, working said lode by driving tunnels, etc., for the purpose of procuring the quartz rock and extracting the gold therefrom, and had, up to said date, expended thereon $1090. The possession

of the said company was open and notorious, and the respondent had actual notice thereof, and of the character and extent of the appellant's claims.

On June 15, 1870, respondent applied to the officers of the proper United States Land Office to purchase the west half of the northeast quarter and east half of the northwest quarter of section fourteen, township thirty-six south, of range three west, of the Willamette meridian, upon which the lode in controversy is situated, and having been allowed to purchase said lands as agricultural lands, a patent therefor was issued to respondent on August 11, 1870. The said patent was recorded July 8, 1871, and until said date the appellant had no notice of the application for and purchase of said lands by the respondent, or that respondent had any claim to or interest in the same.

The respondent demurred to the complaint. After argument the court below sustained the demurrer and dismissed the complaint with costs.

From the order dismissing the same this appeal is taken.

*J. D. Fay and W. W. Thayer*, for Appellant.

*B. F. Dowell and H. Kelly*, for Respondent.

By the Court, McARTHUR, J.:

The claims upon the gold-bearing quartz lode in controversy, were located and taken up in the year 1865 in accordance with the provisions of the act of the Legislative Assembly of the State of Oregon, approved October 24, 1864, and the acts amendatory thereof. They were "opened up" and operated under the State laws for a number of months prior to the passage of the act of Congress of July 26, 1866, commonly called the "Mining Act." This act was the first direct and positive recognition on the part of the General Government of the right of the citizen to explore the public domain for the precious metals, and to denounce and operate mines when found. Anterior to the passage thereof, the General Government, in carrying out a policy redounding to the public good, tacitly consented to

the search for and development of the mines, and the courts, applying what has been often denominated "the common law of the mines," uniformly protected the rights of those engaged in mining for the precious metals. They recognized the binding force of the local laws, customs and usages of the miners, in all cases when those local laws, customs and usages did not conflict with written constitutions or legislative enactments. Taking into consideration the condition of the country and the importance of encouraging mining operations, and the non-action of the General Government, they held that those engaged in mining for the precious metals enjoyed a species of franchise in the mines, and that they held the same free from all molestation or interference of all parties save the General Government.

That the General Government has the exclusive right to control the mines has never been seriously questioned; the principle being conceded that mines of precious metals belong to the eminent domain of the political sovereignty, as well under the laws of Spain as by the common law of England and public law of the United States.

All the reported cases in California and Nevada lead to the conclusion that the non-action of the General Government raised such a presumption of license to those engaged in mining for the precious metals as to give them a standing in the courts to assert their rights and redress their wrongs against all persons except the General Government. The right of mining for the precious metals is a franchise, and the attending circumstances raise the presumption of a general grant from the sovereign of the privilege. (*Conger* v. *Weaver*, 6 Cal. 548; *Merced Mining Company* v. *Fremont*, 7 Id. 327; *Hill* v. *King*, 8 Id. 338; *McKeon* v. *Brisbee*, 9 Id. 142; *Partridge* v. *McKinney*, 10 Id. 183; *State* v. *Moore*, 12 Id. 70; *Curtis* v. *Sutter*, 15 Id. 263; *Hughes* v. *Devlin*, 23 Id. 506; *Horn* v. *Jones*, 28 Id. 202; *Pralus* v. *Jefferson G. and S. Mining Co.*, 34 Id. 559; *Correa* v. *Frietas*, 42 Id. 340.)

Accepting this as a postulate, it follows that the General Government itself could not equitably interfere with or abridge the rights of the miner. We are of opinion that "there are equitable circumstances connected with these

mining claims that are clearly binding upon the conscience of the governmental proprietor that must never be disregarded. Rights have become vested, in virtue of the license, that cannot be divested without a violation of all the principles of justice and reason." In *Sparrow* v. *Strong* (3 Wallace, 104), Chief Justice Chase used the following forcible language: "We know that the Territorial Legislature (of Nevada) has recognized by statute the validity and the binding force of the rules, regulations and customs of the mining districts. And we cannot shut our eyes to the public history, which informs us that under this legislation, and not only without interference by the National Government, but under its implied sanction, vast mining interests have sprung up, employing many millions of capital and contributing largely to the prosperity and improvement of the whole country." The decision quoted from was rendered in December, 1865, and is a clear recognition by our highest judicial tribunal of the underlying principle upon which rests the rules governing this species of property, which have had practical operation for nearly a quarter of a century. It follows, then, that the locators and operators of the claims upon the quartz lode in controversy, were invested with a franchise which the courts would protect and uphold. Thus they stood before the passage of the act of Congress of July 26, 1866. By this act the mineral lands of the public domain, both surveyed and unsurveyed, are declared to be free and open to exploration and occupation to all citizens of the United States, and those who have declared their intentions to become citizens, subject to such regulations as may be prescribed by law. Any person or association claiming a vein or lode of quartz rock in place, bearing gold, silver, cinnabar or copper, who have expended in improvements thereon not less than one thousand dollars, and have occupied and improved the same according to the local customs or rules of miners in the district, and in regard to which there is no controversy or opposing claim, may acquire title to the same by filing a diagram, in the local land office, of said claim, giving notice and performing such other acts as are prescribed by law. As has before been stated, this act

was the first direct and positive recognition on the part of the General Government of the right of the citizen, and the alien who had declared his intention to become such, to explore the public domain for the precious metals, and to denounce and operate mines when found.

Whatever difference of opinion may exist as to the tenure by which mining claims were held prior to the passage of this act of Congress, it is clear that, by the act, the General Government extended to all in possession of mining claims, and to all subsequently locating and denouncing mines containing the precious metals, a guarantee of protection in their occupancy so long as the mines are operated and worked. The lode in controversy was, when "claimed," situate upon surveyed lands belonging to the General Government. Pursuant to instructions, the lands were sold as agricultural lands, and patented to Ish on August 11, 1870. The application to purchase was made subsequent to the passage of the act of 1866, and at a time when the possession of the appellant was open and notorious. Thus the adverse interest of Ish, if any interest he has, did not accrue until after the passage of the said act, and was therefore in violation of the guarantee of occupancy created by the first section thereof. But Ish obtained no interest in the mining claims on the lode by the patent. True, by the patent he obtained a given quantity of agricultural lands, and the lode is situate upon said lands, but the known deposits of precious metals did not pass by the patent, for they are expressly reserved from sale under the pre-emption and other land acts. The only law under which patent to mining claims, either lode or placer, can be obtained, is the act of 1866, and the amendments thereto. The fact that the claims of the appellant were not segregated and listed as mineral lands, cannot avail the respondent. Segregation, when required, must be made by the surveyor; and to hold that the failure of the surveyor to fully discharge his duty could operate to defeat the rights of the appellant, would be violative of the plainest principles of justice. Moreover, the returns of the surveyor are not conclusive as to the character of the lands, for the Commissioner of the

General Land Office, in carrying out the policy of the General Government in the disposal of the public lands, allows affidavits as to the character of the lands to be made in impeachment of the returns of the surveyors. The open and notorious possession of the appellant was sufficient to charge the respondent with notice of the character of the lode, and also to bring the lode within the description of "known mineral deposits." Nor are the rights of the appellant forfeited, nor in the least abridged, by failure to procure a patent for the claims upon the quartz lode. "It is understood," says the Commissioner of the General Land Office, in the instructions to the local land offices, "that there is nothing obligatory on claimants to proceed under the statute (act of 1866), and where they fail to do so, there being no adverse interest, they hold the same relation to the premises they may be working which they did before the passage of the act, with the additional guarantee that they possess the right of occupancy under the statute. (Zabriskie's Land Laws, 207.)

Before leaving this case it becomes necessary to allude to the prayer of the complaint, and to express our views in relation to the proper relief to be afforded. The prayer asks for a decree of the Circuit Court declaring the defendant a trustee for the plaintiff; that the defendant be required to execute a good and sufficient deed to the plaintiff of the land included within the boundaries of the claims, and also for a perpetual injunction inhibiting the defendant from setting up any title to said claims.

Inasmuch as Ish never obtained title to the lode, he cannot be decreed to be trustee for the plaintiff, nor can he execute a deed conveying to the plaintiff the legal title. The proper relief to be granted is an injunction order perpetually enjoining and inhibiting Ish, and all persons claiming, or to claim by or through or under him, from asserting any title to the lode, and also from in any manner interfering with the plaintiff in entering upon and working the claims thereon.

Decree reversed.