**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2021-NMCA-066

Filing Date: September 17, 2021

No. A-1-CA-37258

STATE OF NEW MEXICO ex rel.
OFFICE OF THE STATE ENGINEER,

      Plaintiff-Appellee,

v.

ELEPHANT BUTTE IRRIGATION
DISTRICT et al.,

      Defendants,

and

CHARLES P. BARRETT; MELODY K.
SEARS; R. WM. and NOLAN WINKLER;
ROBIN TUTTLE; ROBERT SHIPLEY;
JIM GOTON; JOHN and AGNES
MCGARVIE; JOHN and CINDY CORNELL;
STANLEY and JOYCE BRODSKY; ARLENE
LYNCH; TURNER RANCH PROPERTIES,
LP; and HILLSBORO MUTUAL DOMESTIC
WATER CONSUMERS ASSOCIATION,

      Defendants-Appellees/Cross-Appellants,

and

HARRIS GRAY, WILLIAM FROST, and
NEW MEXICO COPPER CORPORATION,

      Defendants-Appellants/Cross-Appellees.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**James J. Wechsler, Presiding Judge**

Released for Publication December 14, 2021.

Gregory C. Ridgley, Acting General Counsel
Richard A. Allen, Special Assistant Attorney General

Santa Fe, NM

for Appellee State of New Mexico ex rel. Office of the State Engineer

Davidson Law Firm, LLC
Tessa T. Davidson
Corrales, NM

for Appellee Turner Ranch Properties, L.P.

New Mexico Environmental Law Center
Jonathan M. Block
Eric D. Jantz
Douglas Meiklejohn
Jaimie Park
Charles de Saillan
Santa Fe, NM

Martin, Dugan & Martin
Kenneth D. Dugan
Carlsbad, NM

for Appellee Hillsboro Mutual Domestic Water Consumers Association

Law & Resource Planning Associates, A Professional Corporation
Charles T. DuMars
Tanya L. Scott
Albuquerque, NM

for Appellants

L. Michael Messina PA
L. Michael Messina
Buena Vista, NM

for Amicus Curiae GCM, Inc.

Gallagher & Kennedy, P.A.
Dalva L. Moellenberg
Santa Fe, NM

for Amicus Curiae New Mexico Mining Association

Espinosa & Associates, P.C.
Richard D. Barish
Albuquerque, NM

for Amicus Curiae The Sierra Club

Barncastle Law Firm, LLC
Samantha R. Barncastle
Las Cruces, NM

for Amicus Curiae Elephant Butte Irrigation District

Somach Simmons & Dunn, PC
Sarah A. Klahn
Denver, CO

for Amicus Curiae State of Texas

Navajo Nation Department of Justice
Daniel G. Moquin, Principal Attorney
Window Rock, Navajo Nation, AZ

for Amicus Curiae Navajo Nation

## OPINION

**BUSTAMANTE, Judge Pro Tempore.**

**{1}** We are presented with thorny issues involving the doctrine of relation and the concept of abandonment in our water jurisprudence. As a matter of first impression in New Mexico, we address how the doctrine of relation and its "diligence" requirement should be applied to large, complex projects—in this case an off-and-on, fifty-plus year effort to develop a copper mine. We also examine whether the adjudication court appropriately considered economic, financial, logistical, and legal challenges as factors when it analyzed whether vested water rights had been abandoned.

**{2}** Harris Gray, William Frost, and New Mexico Copper Corporation (NMCC) (collectively, Appellants) ask us to overturn the adjudication court's refusal to recognize their so-called *Mendenhall* rights in water declared but as yet not put to beneficial use. Appellants also argue that the adjudication court's conclusion that they abandoned their rights in some of the wells must be reversed. The Cross-Appellants ask us to reverse the adjudication court's refusal to conclude that Appellants abandoned all of their vested rights through non-use. We affirm in part and reverse in part.

## I.   Procedural Posture and Parties

**{3}** This case arose as an inter se proceeding within the Lower Rio Grande general stream adjudication the State initiated in 1996. Rule 1-071.2(B) NMRA describes a proceeding known as an "expedited inter se" that allows a final determination of water rights to be made prior to the general inter se phase of the general adjudication. In January 2014, Turner Ranch Properties, L.P. (Turner)—owner of the neighboring Ladder Ranch—and a number of members of the nearby community of Hillsboro, New Mexico, and Hillsboro Mutual Domestic Water Consumers Association (collectively,

Hillsboro cadre) asked the adjudication court to establish an expedited inter se proceeding to address the water rights claimed by Appellants at the Copper Flat Mine (the Mine). Appellants initially resisted the request, but later agreed and stipulated to entry of an order establishing an expedited inter se proceeding.

{4}     After the expedited inter se proceeding was established, Appellants filed their statement of claims asserting that their predecessors in interest had placed 1,019 acre-feet of water to beneficial use before the Mine became operational and an additional 1,267 acre-feet of water during the time the Mine was in operation. They thus requested entry of an order recognizing a vested interest in 2,286 acre-feet with priority dates starting in 1975. And, alleging that New Mexico Copper intended to recommence operations at the Mine as soon as all permit and regulatory requirements were met, Appellants also asked the adjudication court to declare that they were entitled to "a reasonable amount of time to develop an additional 5,195 acre-feet of water rights" in accordance with the mining plan created by their predecessors in interest.

{5}     The matter was tried over a ten-day period, split between sessions in March and June 2016. Participating at trial were the Appellee State Engineer, Appellants (individually, "Frost & Gray" and "New Mexico Copper"), Turner, and the Hillsboro cadre. The trial focused on two primary issues: (1) the amount put to beneficial use before the Mine shut down, and (2) whether Appellants and their predecessors exercised reasonable diligence in following the plan to extract copper from the Mine and put water to beneficial use. The parties submitted requested findings of fact and conclusions of law in January 2017. In December 2017, the adjudication court filed detailed annotated findings of fact and conclusions of law. The adjudication court entered its subfile order and judgment as a final judgment on February 28, 2018, recognizing a vested right in Frost & Gray to use 861.84 acre-feet per year of water for mining-related purposes and 3 acre-feet per year for livestock purposes representing water put to use while the Mine was operational. The adjudication court denied all other relief to Frost & Gray. The adjudication court granted New Mexico Copper 34.45 acre-feet per year from the so-called open-pit for dust control. The parties timely appealed and cross-appealed. The State did not join in the cross-appeal.

## II.     Factual Background

{6}     The adjudication court's unchallenged findings of fact, together with the exhibits and testimony adduced at trial, paint an interesting history of the Mine and the efforts made over a fifty-odd-year-period to pull copper from the Copper Flat ore body near Hillsboro, New Mexico. We will retell the tale in some detail in order to provide context for the parties' arguments and for our ruling. Given that we are applying *State ex rel. Reynolds v. Mendenhall*, 1961-NMSC-083, 68 N.M. 467, 362 P.2d 998—and the doctrine of relation generally—to a new factual scenario, a full explication is called for.

{7}     Copper Flat was used primarily for placer mining from the late 1800's to the 1960's. Late in the 1950's and early 1960's, a few exploratory geologic cores were drilled as a first step in determining whether commercial mining was feasible. The

record does not reveal who initiated these early efforts, but they apparently resulted in a report "that identified the potential of thirty million tons of copper-bearing rock." According to Turner's expert James Kuipers, the 1964 report did not indicate that any water had been developed as of that date and that no mine development plan was in place. In fact, the 1964 report suggested that the only possible method of mining the "very low-grade [ore] deposits . . . is large-scale leaching in place." There is no indication in the record that any such plan was ever created or followed; nor is there any indication that any other exploration occurred on the property until the 1970's.

{8}     Inspiration Development acquired Copper Flat in 1967 and began further exploration, including drilling twenty-eight to thirty more holes by 1973. The results of the additional drilling warranted a preliminary feasibility study and the beginnings of a plan for an open pit mine. In mid-1974, Quintana Minerals Corporation (Quintana) leased the Copper Flat property from Inspiration and began its own, more extensive exploration program involving approximately 146 diamond drill holes. The results were promising enough that Quintana expanded the project to 12,000 acres and contracts were let for engineering and construction. In addition, Quintana drilled and tested three production wells designed to provide water sufficient to supply the design capacity of the mill. But all activity was halted in late 1976 due to depressed prices for copper.

{9}     Quintana resumed work at Copper Flat in 1979 as copper prices improved. Quintana reevaluated the project in light of changed economic conditions, including a new engineering study. In September 1979, Quintana and Phibro, Inc., signed a letter of intent to form a partnership (Copper Flat Partnership or CFP) to develop the mining operation at Copper Flat with Quintana acting as operator and managing agent of the Mine. CFP executed a new lease of CFP with Inspiration consisting of three patented mining claims, 294 unpatented mining claims, and 160 unpatented mill sites. CFP obtained financing in the amount of $75 million from Canadian Imperial Bank of Commerce (the Bank) based in Toronto. The loan was secured by a deed of trust that conveyed title to the entire project to the trustee. In the event of a default, the deed of trust was to be conveyed to the Bank.

{10}    Construction activities began in July 1980, including, (1) construction of a 7-mile, 20-inch pipeline from the production well field to the mill site; (2) drilling of an additional production well; (3) installation of water storage tanks; (4) installation of temporary, and then permanent, power. The mill construction was complete by the end of 1981, and by early 1982, the facility was operational.

{11}    The mill started processing ore in March 1982. Ore processing basically met the designed and desired parameter of 15,000 tons per day throughput. The Mine stopped processing ore at the end of June 1982, as a result of a drop in copper prices. When CFP started construction the global copper price was $0.953 per pound. CFP calculated that the Mine would break even at $0.90 per pound. On June 30, 1982, the price of copper was $0.642 per pound. The Mine was never put into operation again.

**{12}** The adjudication court found that as of June 1982, CFP "hoped and expected that the mine would reopen if (1) an investor could be identified that would fund a potential resumption of operations[;] and (2) the global price of copper would increase such that a resumption of operations was feasible." Between July 1982 and the end of 1983, CFP hosted three or four potential investors or buyers at the Mine site. These efforts were not successful. By March 1984 CFP had defaulted on its loan with the Bank.

**{13}** On September 17, 1982, the State Engineer declared the Lower Rio Grande Underground Water Basin (the LRG basin). In response to the declaration of the LRG basin, and on advice of counsel, by the end of 1982 CFP began gathering the information necessary to file a declaration of underground water rights for each of the eighteen wells and the open pit located on the Mine grounds. CFP filed its original declarations on February 17, 1984, in the total amount of 6,462 acre-feet per year, representing water it had actually used and water it intended to use.

**{14}** By March 1984, CFP had defaulted on its loan obligations to the Bank. At the same time, Quintana relinquished its management responsibilities for the Mine effective April 1, 1984. As a result of the default, the Bank began exerting more control over the Mine leading to the "eventual closure and liquidation of Copper Flat."

**{15}** As early as December 1983, CFP and the Bank were "aware of its legal counsel's belief that the water rights, if perfected, could possibly be worth millions of dollars." In the spring of 1984, CFP and the Bank were already exploring the possibility of transferring the water rights—vested and inchoate—to a new location for use by a new owner. As time progressed, prospects for resuming operations at the Mine dimmed. In the spring of 1985, CFP and the Bank began considering options for shutting the Mine entirely, aware that the potential water rights "could be the most valuable of the assets if they can be severed from the property." In April 1985, the Bank asked for a legal opinion concerning the practical and legal considerations it faced if it decided to pursue a sale of the water rights connected to the Mine. Counsel's bird's eye view of the legal problems likely to arise feature many of the issues being argued before us.

**{16}** In February 1986, CFP filed an application for a permit to change location of wells and place and purpose of use of underground waters. In the application CFP asserted that it had entered into "an agreement with the State of New Mexico Office of the Commissioner of Public Lands" to transfer 6,462 acre-feet per year to wells located in the general vicinity of Las Cruces for a variety of uses, including utilities, recreational, aesthetic, industrial, manufacturing, residential—and other—uses. The area indicated was some sixty miles south of the Mine. In support of its application, CFP asserted that the water rights could not be economically used at the Mine currently or in the near future. The application drew protests from a number of other users and was eventually withdrawn by Gray after CFP and the Bank sold the water rights to him in 1987.

**{17}**   At the same time that CFP and the Bank were exploring options for sale or transfer of the water rights, they began considering options for disposal of the Mine's physical assets and the type of reclamation programs that might be required by the Bureau of Land Management (BLM). In April 1985, Milton W. Hood, a mining consultant advising CFP and the Bank, suggested two options for reclamation: (1) total stripping and sale of the assets and return of the leases to Inspiration; or (2) sale of the buildings and equipment, capping the wells and leaving water lines, tanks, foundations, and tunnels in place for " 'possible' future rebuilding." In May 1985, following a site visit by BLM personnel, Hood expanded on the two options, describing the prior "total stripping" option as "complete abandonment[,]" and noting that this option would require compliance with the BLM standards. He suggested preparing budget estimates for both options for presentation to the Bank. The budget estimates received were starkly different, with "Proposal A-total stripping" costing $50,000 and "Proposal B-complete abandonment" costing $548,832. The work eventually done comports with Proposal B.

**{18}**   As of April 1986, the Bank had sold all removable physical assets of the Mine to a company headquartered in Papua, New Guinea. The Bank retained all "land holdings, permits, rights-of-way, roads, and water rights." In accordance with the agreement, the buyer removed all buildings and equipment at the Mine down to the concrete foundations by December 31, 1986.

**{19}**   In January 1986, the Bank informed Inspiration of its plans to remove all structures from the Mine and perform reclamation as required by the "governing agencies involved." The Bank offered to leave the office/lab building on the site for Inspiration's use, but Inspiration declined. CFP and the Bank cancelled its lease interests in the Mine property effective December 31, 1986, and the property—including mining permits—reverted to Inspiration. The four production and six monitoring wells drilled by Quintana did not revert because they were located on land acquired entirely by Quintana.

**{20}**   In late 1986, CFP and the Bank considered an offer to salvage the Mine's water pipeline, subject to BLM approval of the sale. BLM did not approve the sale on the grounds that digging up the line would cause "undue and unnecessary degradation" of the BLM lands within the Mine property. "It is typical industry practice to leave underground pipelines and electrical power lines in place as part of the reclamation process . . . [because] removal would only serve to further disturb the area." By February 5, 1987, reclamation efforts on BLM land were complete and, in a letter to the State of New Mexico Environmental Improvement Division, CFP and the Bank "restated that the Copper Flat Property is []permanently [c]losed and will not be restarted."

**{21}**   It is a common practice in the copper mining industry to cease operations when copper prices drop sufficiently to make operations economically not feasible. The degree to which operations cease varies, ranging from a temporary cessation that leaves a mine's infrastructure in place, maintained and ready to resume—colloquially termed "mothballing"—to permanent abandonment of a mine with no intent to resume. The adjudication court found that the Mine was not "mothballed." Rather, it found that

the Mine was closed and operations terminated. It also found that CFP abandoned its operations at the Mine and thus "abandoned its plans to develop a mine at Copper Flat." And, finally, it found as a fact that "[u]pon liquidation of the [M]ine's assets, CFP and [the Bank] did not intend for the water rights to be used exclusively for mining."

{22}   As of February 1987, CFP and the Bank had completed liquidating the Mine's physical assets and had given up their lease covering the mining claims and permits but had not been able to locate a buyer for their claimed water rights. Sometime in 1985 or 1986, Frost became aware that the Mine's assets were being liquidated. Frost was then a real estate agent who had been involved in the transfer of water rights in his practice and thus had developed an understanding of the value of water rights in New Mexico. Frost suggested to his friend Gray that Gray consider buying the Mine's water rights as an investment. Gray, at that time was a practicing certified public accountant in Silver City, New Mexico. Gray's clients included farmers and ranchers, who owned water rights and, as such, Gray was also familiar with the monetary value of the owner's water rights. Frost informed Gray that the amount of water available was significant, and there was a possibility they could be purchased for $20,000. Reasoning that Gray might be able to lease the rights to other copper mining operations at Copper Flat, Gray decided to pursue the purchase and asked Frost to make inquiries. At some point Frost and Gray became partners in the venture to buy the water rights.

{23}   Frost made a verbal offer to purchase and received a verbal acceptance. On March 26, 1987, Gray sent a letter to CFP and the Bank offering to "purchase all the water right assets of [CFP] for $20,000." The offer was accepted and, Gray received a quitclaim deed and a bill of sale from CFP. The quitclaim deed and bill of sale transferred "title, and interest, if any, in and to inchoate and beneficially used water rights of approximately 6,462 acre-feet" associated with the four production wells and six monitoring wells Quintana had drilled. Even though the deed and bill of sale were not executed by CFP until April 7, 1987, Gray executed a change of ownership of water right document—through his attorney at the time, Clifford K. Atkinson—on March 31, 1987. The form was filed with the State Engineer on April 2, 1987. Upon being put on notice, that the same water rights were subject to CFP's 1986 transfer application, Gray requested that the State Engineer withdraw that application.

{24}   "Frost & Gray bought the water rights for investment purposes. Neither [of them had] ever worked in the mining industry in any capacity." Frost & Gray did essentially nothing to market or find potential mining company lessees for the water rights for almost two years. At some point, concerned that they could lose the water rights for nonuse, Frost & Gray approached Gerald Lyda, the then-owner of the Ladder Ranch about his interest in the water. As part of those discussions, Gray filed an application to change point of diversion and place and/or purpose of use from ground water to surface water in September 1988. The application asked that 6,462 acre-feet of water be transferred to the Ladder Ranch for recreation and irrigation purposes. It listed a new point of diversion as Seco Creek behind an earthen dam. The application also noted that Gray intended to plug the wells following the transfer. Frost & Gray executed an agreement describing their arrangement with Lyda in February 1989. While Frost &

Gray hoped that filing of the transfer application might attract the attention of mining interests, they fully intended to follow through on their obligations under the agreement with Lyda.

**{25}**   The application to transfer the water rights drew an immediate protest from a company called Hydro Resources Corporation (Hydro Resources) that—apparently unbeknownst to Frost & Gray—had in 1987, purchased an option from Inspiration to buy the mining claims at Copper Flat. In July 1989, Frost & Gray filed an objection to Hydro Resources' protest asserting that Hydro Resources had no standing to protest because it had made no showing that it owned or claimed a "relevant" water right. On July 25, 1989—following some internal corporate machinations not relevant to this case—another entity called Cobb Resources entered into an agreement to sell the Copper Flat mining claims to a company called Copper Flat Mining Company, Ltd. (CFMC). The agreement was finalized using a special warranty deed executed November 16, 1989.

**{26}**   On January 5, 1990, CFMC filed an application for change of ownership of water right to it from CFP—the entity that had created, operated, and then abandoned the Mine earlier. This action set up a conflict with Gray's application for change of ownership filed in April 1987. The conflict never came to a head. In April 1990, CFMC sold the mining claims to Gold Express Corporation (Gold Express). In January 1991, Gold Express entered into an agreement with Frost & Gray to lease the water rights in exchange for shares of stock and annual cash payments.

**{27}**   Gold Express prepared and submitted a plan of operation for the property to the BLM proposing to "rebuild the entire Copper Flat mining facility as it existed in 1986." Interestingly, its plan for reclamation "at end of mine life" was to return the area to "today's 1991 condition." Despite its plan, Gold Express apparently did not do anything on the property and "did not put [any] water to beneficial use at Copper Flat."

**{28}**   Alta Gold Corporation acquired an option to purchase Copper Flat from Gold Express in the fall of 1993. It exercised the option in mid-1994. In May 1994, Frost & Gray entered into an agreement with Alta Gold stipulating that Alta Gold would succeed to Gold Express's rights and obligations under their 1991 contract with Gold Express. "From 1991 to 1999, Gold Express and Alta Gold paid Frost & Gray a total of $400,000 for [their] consent to use the water rights."

**{29}**   Alta Gold's plan of operation at Copper Flat was very similar to CFP's, including recovery and reuse of the salvageable infrastructure left after CFP and the Bank abandoned the Mine. Alta Gold made efforts to purchase a mill and to lease trucks in order to begin operations. However, Alta Gold was never able to begin construction or other activity on the ground. As it waited for issuance of a final Environmental Impact Statement (EIS)—a federal regulatory prerequisite to any operations on the ground—Alta Gold in 1999 filed for bankruptcy. Alta Gold did not put water to beneficial use at Copper Flat.

**{30}** In January 2001, Hydro Resources appeared on the scene again. This time it filed suit seeking a declaratory judgment to quiet title to the water rights and claims at issue in this case. *See Hydro Res. Corp. v. Gray*, 2007-NMSC-061, ¶ 10, 143 N.M. 142, 173 P.3d 749. Hydro Resources alleged that the water rights were appurtenant to the mining claims developed for Copper Flat. *Id.* ¶ 11. The matter proceeded through the courts for almost seven years until our Supreme Court issued its opinion resolving the issue in favor of Frost & Gray. *See id.* ¶ 48.

**{31}** After the case ended, Frost & Gray's sole effort to find a mining company willing to take on the project consisted of one letter to a company mentioned to Frost by a friend. Nothing came of the effort. In July 2009, a new mining venture—New Mexico Copper—agreed to an option and purchase agreement with Hydro Resources and others to buy the real property and mining claims still extant at Copper Flat. Eleven months later New Mexico Copper entered into an option and purchase agreement to acquire Frost & Gray's water rights. New Mexico Copper has been more active on the ground than its predecessors. As of the time of the trial, for example, it had uncovered the foundation structures buried by CFP when it abandoned the Mine. And, in February 2012, it filed an application for permit to repair and/or deepen well for the four production wells and the six monitoring wells. The request was approved by the State Engineer with the limitation that diversion would be limited to 888.783 acre-feet per year—the amount of water used while the Mine was in operation. To the extent New Mexico Copper attempted to have the prebasin claim of 6,462 acre-feet per year approved, the State Engineer denied the request "as 'entirely inchoate' and 'at no time been put to beneficial use.' " As of the time of trial, New Mexico Copper had not completed the regulatory requirements needed to start operations and production. The adjudication court found that no mining company has operated a copper mine at Copper Flat since July 1982, and that no water from the production wells has been put to beneficial use for mining since the acquisition of water rights by Frost & Gray.

**{32}** Before we proceed to the legal analysis, it is worth emphasizing again the uniqueness of the factual circumstance we are presented. We are asked to apply the doctrine of relation to what is now a fifty-year-old copper mining effort involving a series of parties in the role of owner, lender, developer, and miner. That long-time span and shifting actors would present a difficult problem by itself. The difficulty is compounded by the fact that when Frost & Gray purchased CFP's water right, the mining project did not in any real sense exist. CFP and the Bank had sold all of the above-ground infrastructure. The site was reclaimed and bare of facilities and equipment. In addition, CFP had returned the land lease and mining claims to Inspiration, their owner. CFP had neither the intent nor the ability to return and start mining again. And Inspiration had decided it had no interest in mining in the area. Thus, *Mendenhall* rights claimed by Appellants arise from a scenario in which the water claims, the Mine infrastructure, and the mining permits were legally and physically separated from each other.

**{33}** The facts are new to New Mexico's water jurisprudence. But New Mexico is not an outlier in this regard. The parties have not cited any cases with a remotely similar

fact pattern and our independent research has not borne fruit either. As we proceed, we are mindful of the old adage that hard facts can make for bad law.

## III.    The Frost & Gray/NMCC Appeal

**{34}**    As noted above, Frost & Gray and New Mexico Copper argue that the adjudication court erred in not recognizing their *Mendenhall* rights and in concluding that they had forfeited or abandoned all rights attached to the thirteen miscellaneous wells on the site. The parties appear to disagree as to the standard of review applicable to the *Mendenhall* issue. We thus address that issue first.

### A.    Standard of Review

**{35}**    Appellants do not challenge the adjudication court's findings of fact. Appellants acknowledge that they "are the facts upon which the case rests on appeal and are binding on this [C]ourt." *Gallegos v. Kennedy*, 1968-NMSC-170, ¶ 6, 79 N.M. 590, 446 P.2d 642. Appellants assert that it is the legal effect of those facts that is at issue and thus review should be de novo. The State Engineer asserts that we should apply a substantial evidence standard of review and consider only whether there is relevant legal evidence in the record supporting the adjudication court's findings. The State Engineer also faults the Appellants for failing to set out in their arguments *all* of the evidence that bears on the contested issues in the appeal.

**{36}**    Appellants' position is closer to the mark. *See Jones v. Schoellkopf*, 2005-NMCA-124, ¶ 8, 138 N.M. 477, 122 P.3d 844 ("When the facts are not in dispute, but the parties disagree on the legal conclusion to be drawn from those facts, we review the issues de novo."). Having accepted the findings of fact entered by the adjudication court, Appellants have conceded that there is sufficient evidence in the record to support them. We will indulge all reasonable inferences to be drawn from the evidence in favor of the adjudication court's findings. *See id.* The question then becomes whether the findings and the reasonable inferences drawn from them support the adjudication court's conclusions of law. In arguing their position, Appellants cannot pick and choose which facts they think are most favorable to them. They must accept the findings in their entirety and make their arguments in light of all the findings. To the extent they may have failed to do so, as suggested by the State, it is not fatal to Appellants' efforts, however. Appellants' argument that the adjudication court failed to properly take some facts and factors into account and over-emphasized others because it misunderstood, and thus, misapplied the doctrine of relation presents a legal question.

### B.    The Doctrine of Relation

**{37}**    *Mendenhall* has become emblematic of the doctrine in New Mexico, but the doctrine has much deeper roots—intertwined with the roots of prior appropriation—that should not be ignored or forgotten. The earliest recognition of prior appropriation as a means of gaining rights in water—rather than the old common law rule of riparian rights—is probably to be found in *Irwin v. Phillips*, 5 Cal. 140 (1855). *Irwin* involved a

dispute between two miners operating on public lands over access to and control of waters running in a stream. *Id.* at 146-47. One miner had previously diverted water from the stream and put it to use by way of a canal. *Id.* The second miner later staked a claim on the banks of the stream and claimed control of its water as a tenant on the land. *Id.* The California court resolved the case by recognizing and applying the firmly established custom among miners in the area that the first person in time to divert and "appropriate" waters for use had the superior claim. *Id.*

{38}    Immediately, the California courts were faced with the problem of how to decide who was "first in time" as among competing claimants when water had not been put to use by the party first on the scene before later claimants to the same source were able to complete their appropriation by putting the water to use. The issue was not present in *Irwin* because the first miner had completed his appropriation. In the first case addressing the issue—*Kelly v. Natoma Water Co.*, 6 Cal. 105 (1856)—the defendant Natoma Water Co. erected canals in 1852 designed to carry water to miners down the mountain. Natoma purchased a dam in September 1853 and erected another to capture the water and convey it some twenty miles away. *Id.* at 105-06. One of the dams leaked water into an arroyo on the route to the miners. *Id.* at 106. Natoma did nothing to fix the leak or recapture the waters. *Id.* The plaintiff Kelly built a dam in October 1853, captured the leaked water and started selling to other miners. *Id.* In 1854 Natoma built a dam about one hundred yards above Kelly's dam cutting off Kelly's supply. *Id.* Kelly sued and the trial court found in favor of Kelly. *Id.* The court affirmed holding that "[p]ossession, or actual appropriation, must be the test of priority in all claims to the use of water[.]" *Id.* at 108*.* The court decided that a mere plan to possess the leaked water was not sufficient because appropriation is not complete until there is an actual diversion or use of water. *Id.* But, citing *Stark v. Barnes*, 4 Cal. 412 (1853), the *Kelly* court indicated that if Natoma had started to build the offending dam in good faith before Kelly completed its appropriation, the old common law property doctrine of relation would have applied and Natoma would have prevailed. 6 Cal. at 108.

{39}    The California Supreme Court next relied on the doctrine of relation—though not by name—in *Conger v. Weaver*, 6 Cal. 548 (1856). In *Conger*, a canal company providing water for gold mining built a flume across a saw-mill yard thereby preventing the mill owner from getting his lumber to the mill. *Id.* at 548-49. "The mill was completed in July[] 1855." *Id.* at 549. The flume was built in November 1855, though work on it, including surveying and staking, started in 1853. *Id.* A jury found in favor of the flume owner, and the California Supreme Court affirmed. *Id.* Noting that works of this kind require time to complete, the court held that the initial work done was sufficient to require that the effort once completed should be recognized, enforced, and protected as of the time it began. *Id.* at 558. The court did not analyze in any detail why the initial work was enough to give the flume owner a superior right. But it did explain that it was appropriate to apply the doctrine of relation to water claims in order to protect the work done by prior appropriators against later acts perhaps "actuated by malice or self-interest." *Id.*

**{40}**     Thirteen years later the California Supreme Court explicitly added the requirement that would-be appropriators had to proceed diligently with their work in order to enjoy the benefit of relation. *Nevada Cnty. v. Kidd*, 37 Cal. 282, 310-14 (1869). The court summarized the rule as follows:

> As has already been remarked, even the preliminary, inchoate right to acquire in the future a right to water, which, when it becomes perfected and fully vested, will date, by relation to the first act, for purposes of priority, may be lost by want of diligence in pursuing the work and perfecting the right, so that another party, more diligent, although commencing subsequently, may obtain the first right by actual appropriation and possession of the water.

*Id.* at 314. Recognizing the possibility for abuse of the benefits of the doctrine of relation, the court warned against "dog in the manger" tactics of "claiming water by certain preliminary acts, and from that moment prevent others from enjoying that which he is himself unable or unwilling to enjoy, and thereby prevent the development of the resources of the country by others." *Id.*

**{41}**     The best early explanation of what might constitute "diligence" in this context was provided by the Nevada Supreme Court in *Ophir Silver Mining Co. v. Carpenter*, 4 Nev. 534 (1869). *Ophir* involved competing claims to water from the same river by two ditch or canal owners. *Id.* at 541-42. The first started his project in 1858, completed some portion of it and conveyed some water. *Id.* at 542. He then let it lay essentially fallow for at least two years before changing the plan for the ditch and enlarging it. *Id.* at 544. The new ditch was completed in 1865 and carried ten times as much water as the first iteration of the ditch. *Id.* at 542-43. The second claimant started construction on a ditch in July 1859 and completed it in the fall of 1860. *Id.* at 543. This latter ditch had been used to its capacity from the time of its completion for "motive power." *Id.* The second claimant conceded that the first ditch owner had a superior priority to the amount of water its first ditch could first carry, but no more. *Id.* The court agreed with the second claimant, concluding that the first had not completed its works with diligence. *Id.* at 548. Its discussion of diligence is as relevant today as it was in 1869.

> Diligence is defined to be the 'steady application to business of any kind, constant effort to accomplish any undertaking.' The law does not require any unusual or extraordinary efforts, but only that which is usual, ordinary, and reasonable. The diligence required in cases of this kind is that constancy or steadiness of purpose or labor which is usual with men engaged in like enterprises, and who desire a speedy accomplishment of their designs. Such assiduity in the prosecution of the enterprise as will manifest to the world a *bona fide* intention to complete it within a reasonable time. It is the doing of an act, or series of acts, with all practical expedition, with no delay, except such as may be incident to the work itself.

*Id.* at 546.

**{42}**     Thus, the contours of the doctrine of relation as it applied to claims to water under the western concept of prior appropriation were well known within twenty years after the concept first arose. Relation in this context embodied two features: (1) embarking in good faith on a project to appropriate water; and (2) consummating the project without unnecessary delay by exercising reasonable diligence in constructing facilities, diverting water, and completing the appropriation by applying the water to beneficial use. If the would-be appropriator met the requirements, it would attain a vested right to use the water with a priority date measured as of the time the project commenced. Prior to application of the water to use, however, there was no present water right in any sense; only the right to diligently pursue a future right to the possession of the water. *Kidd*, 37 Cal. at 310; *see Keeney v. Carrillo*, 2 N.M. 480, 493 (1883).

**{43}**     The rule requiring diligence in pursuing the work initially grew out of the custom among the miners working their claims, but quickly became associated with the property concept of relation as a doctrinal matter. The doctrine of relation provided a theoretical basis for protecting the interests of persons undertaking a potentially long and expensive process from frustration at its end. The equitable features of the doctrine of relation thus have their roots in a common law rule of property law. *See* 2 Clesson S. Kinney, *A Treatise on the Law of Irrigation and Water Rights* §§ 743-44, 1284-88 (2d ed. 1912). The protection afforded by relation obviously provided incentives for developers, which helped spur development of water resources in the arid west. *Conger*, 6 Cal. at 557-58. Relation also worked on a practical level, helping to set and sort expectations among conflicting claims. As the court in *In re Hood River*, 227 P. 1065, 1075 (Or. 1924) (in banc), noted: "Except for its application the doctrine of appropriation would have resolved itself into a scrambling rush for the possession of the water right, and the question would always be decided in favor of the one who either had the most money or the one who had the least to do to effect a diversion of water."

**{44}**     The doctrine of relation was first applied in New Mexico in *Keeney*, cited above. But the doctrine was most fully explored in *Millheiser v. Long*, 1900-NMSC-012, 10 N.M. 99, 61 P. 111. In *Millheiser*, two would-be appropriators both claimed to have a right in the waters of the Rio Hondo in southern New Mexico. *Id.* ¶ 2. One claimant built a ditch in 1885 and claimed control and ownership of the entire flow of the river. *Id.* The second built his ditch in 1888 and claimed ownership only of the amounts he had actually used on his lands. *Id.* The trial court ruled in favor of the first appropriator. *Id.* Our Supreme Court reversed, holding that the trial court had erred by granting priority based on time of diversion rather than on appropriation to a beneficial use. *Id.* ¶ 3. The Court quoted Kinney's treatise on water rights to clarify that to constitute a valid appropriation of water, there must be:

> (1) A bona fide intention to apply the water to some beneficial purpose; (2) notice of such intent; (3) diversion of the water from its natural channel by construction of works within a reasonable time; (4) actual application of

the water to the land for some beneficial use, with due diligence and without unnecessary delay.

*Id.* ¶ 8 (internal quotation marks and citation omitted). Our Supreme Court noted that the first ditch diversion did manage to take all of the natural flow of the river, but the owners of the ditch had never watered more than 200 acres of land with the water. *Id.* ¶ 12. The remainder had been returned to the river channel. *Id.* The Court concluded that the first diverter only had a water right to the extent it had actually used the water. *Id.* ¶¶ 30-34. As a corollary to that ruling, the Court also held that the first diverter's sales of water rights to others in excess of its own usage was improper and invalid: they could not sell what they did not own. *Id.* ¶ 32.

**{45}** For purposes of this opinion, *Millheiser* is important for two reasons. First, its citation of the Kinney treatise presages the definition of water rights found in our constitution and statutes. *See* N.M. Const. art. XVI, §§ 2- 3; NMSA 1978, § 72-1-2 (1907). Second, it illustrates how closely the elements of prior appropriation and the doctrine of relation had become intertwined by 1900, both here in New Mexico and across the arid west. *See In re Hood River*, 114 Ore. 112.

**{46}** But, as the authors of the treatise in Jason Anthony Robison & Anthony Dan Tarlock, *Law of Water Rights and Resources*, § 5:64, at 344-46 (2020 ed.), the authors have noted: "Relation back was designed for an era of small ditches. It gave the appropriator time to finance his diversion works, but was relatively unforgiving of excuses. Long delays in putting water to beneficial use suggested speculation and could result in a loss of early priority." The treatise suggests that courts have adjusted the doctrine to accommodate more complex projects. Colorado offers the most instances of a court searching to provide broader guidelines for the evaluation of large projects. *See Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 36 (Colo. 1997) (en banc) (articulating a six-factor test for modern nonspeculative projects); *see also In re Gen. Adjudication of All Rights to Use Water in Big Horn River Sys.*, 48 P.3d 1040 (Wyo. 2002). New Mexico has similarly made room in its relation doctrine to accommodate questions of future use by industry and municipalities. *See In re Plains Elec. Generation*, 1988-NMCA-011, ¶ 2, 106 N.M. 775, 750 P.2d 475 (affirming a decision approving a transfer of water rights even though the user could not put the water to use immediately but could put it to use within a reasonable time); *State ex rel. State Eng'r v. Crider*, 1967-NMSC-133, ¶ 30, 78 N.M. 312, 431 P.2d 45 (recognizing that cities had a right to appropriate water for future uses so long as the water was applied to beneficial use within a reasonable time).

**{47}** But these iterations of relation have not changed the bedrock requirement of diligently applying water to beneficial use within a reasonable time given the circumstances at hand. The cases from the beginning, understood that each case would have to stand and be decided on its facts. For example, Colorado denied the City of Denver the benefit of relation with regard to one of its projects because the city and its predecessors had not proven due diligence in bringing the project to beneficial use in a reasonable time. *See City & Cnty. of Denver v. N. Colo. Water Conservancy Dist.*, 276

P.2d 992 (Colo. 1954) (en banc); *see also Colo. River Water Conservation Dist. v. City & Cnty. of Denver*, 640 P.2d 1139, 1143 (Colo. 1982) (en banc) (holding that non-project related efforts to protect or promote future development were not enough by themselves to support a finding of diligence). In the latter case, the court made clear that the river district was not exempt from the same development efforts required of other developers simply because it had been created by the general assembly. *Colo. River Water Conservation Dist.*, 640 P.2d at 1143.

**{48}** *Mendenhall* for the first time applied the doctrine of relation to underground water sources through a court decision. That development should not have been a surprise to anyone. New Mexico extended the authority of the state engineer to administer the state's underground waters by statute in 1927. *See* 1927 N.M. Laws, ch. 182, § 2. Our Supreme Court held in *Yeo v. Tweedy*, 1929-NMSC-033, 34 N.M. 611, 286 P. 970, that the statute did not unconstitutionally deprive private land owners of any vested rights in the waters beneath their land. *See id.* ¶ 38. The Court reasoned that the statute was merely declaratory of the common law of prior appropriation as declared in the " 'Colorado doctrine'—the most far-reaching" of the various flavors of prior appropriation—and prevalent in New Mexico from the time it came within the jurisdiction of the United States. *Id.* ¶¶ 11-14. Asserting that the law of riparian rights had never held sway in New Mexico, the Court held that as a matter of logic the doctrine of prior appropriation had always applied to underground waters. *Id.* ¶¶ 11-14, 19. Our Supreme Court affirmed this reading of *Tweedy* in *Pecos Valley Artesian Conservancy District v. Peters*, 1945-NMSC-029, ¶¶ 42-44, 50 N.M. 165, 173 P.2d 490. Given this history, it was but a short hop for *Mendenhall* to find that the doctrine of relation applied to underground waters as well.

**{49}** The second aspect of *Mendenhall* is more interesting. The reported cases discussing relation prior to *Mendenhall* involved disagreements between directly competing claimants to the same water source. *See Hagerman Irrigation Co. v. McMurry*, 1911-NMSC-021, 16 N.M. 172, 113 P. 823 (involving claims to the waters of the Rio Hondo); *Rio Puerco Irrigation Co. v. Jastro*, 1914-NMSC-041, 19 N.M. 149, 141 P. 874 (involving directly competing claims to the waters of the Rio Puerco); *Farmers Dev. Co. v. Rayado Land & Irrigation Co.*, 1923-NMSC-004, 28 N.M. 357, 213 P. 202 (involving competing claims, one based on the general, pre-statutory law of appropriation, and one based on a permit filed with the state engineer pursuant to the Appropriation Act of 1907).

**{50}** *Mendenhall* did not involve competing claimants. The issue in *Mendenhall* was whether the claimant could "acquire a water right with a priority date as of the beginning of his work, notwithstanding the fact that the lands involved were put into a declared artesian basin before work was completed and the water put to beneficial use on the ground[.]" 1961-NMSC-083, ¶ 1. The "competing claim" in *Mendenhall* was not another water user; rather it was the right and power of the state engineer to impose its permitting system on a project whose development overlapped his declaration of the basin. The effect of applying the doctrine of relation was to insulate the Mendenhalls from past or potential future rivals under the permit system.

**{51}**     The flexibility exhibited by the Court in doing so did not change the basic requirements of appropriation or relation, however. In framing the issue presented to it, the Court presumed completion of the project with reasonable diligence and concurrent application of the water to beneficial use.[1] *Id.* That the normal requirements of relation apply to similar cases was confirmed by our Supreme court in *State ex rel. Reynolds v. Rio Rancho Estates, Inc.*, 1981-NMSC-017, 95 N.M. 560, 624 P.2d 502, and by this Court in *State ex rel. Martinez v. McDermett*, 1995-NMCA-060, ¶ 8, 120 N.M. 327, 901 P.2d 745 (holding that completion of wells and ditches sufficient to irrigate eighty-four acres did constitute diligence with regard to the entire tract for purposes of the doctrine of relation when the works were never used to irrigate more than twenty acres).

**{52}**     In sum, the concept of relation has been applied to determine priority to water since the earliest days of the development of the doctrine of prior appropriation. It has been adapted flexibly to meet new circumstances as cases presenting new issues arose. *See* 2 Kinney, *supra*, §§ 735-37, at 1269-72. But the core of relation—requiring a lawful commencement of an appropriation with notice to the world of intent, followed by diligence in bringing the planned appropriation to fruition by application of water to a beneficial use in a reasonable time—has remained the same. The question in each case is whether in a given circumstance the would-be appropriator has been diligent. Our task is to determine whether the adjudication court applied the doctrine correctly to the facts in this case. We now turn to that analysis.

### C.     The Adjudication Court Did Not Err in Refusing to Recognize Appellants' Claimed Right Under *Mendenhall*

**{53}**     Appellants' arguments group themselves into four assertions: (1) the adjudication court should not have treated CFP's cessation of mining as relevant to the question of diligence; (2) the adjudication court should not have considered the transfer applications filed by CFP and Frost & Gray as "establishing" lack of diligence; (3) the adjudication court erred in refusing to find in their favor as a matter of equity since doing so would not result in any injury to junior users; and (4) the adjudication court did not take proper consideration of the "logistical, legal, and economic challenges of the mining industry." We discuss them in turn.

---

[1]The opinion in *Mendenhall* did not dwell on the factual and procedural posture of the case. The briefs in the case reveal that the case arose from a basin adjudication case filed in 1956 on relation of the State Engineer and the local conservancy district. Defendants Mendenhall were not made parties until March 1959. In May 1959, the State Engineer made an offer of judgment acknowledging the Mendenhall's water right. The offer was accepted. Sometime in September 1959, the State Engineer withdrew the original offer and submitted an amended offer of judgment. The Mendenhalls refused the amended offer. *Mendenhall*, Brief in Chief, at 1-2, *Mendenhall v. State of N.M. ex rel. Reynolds*, 1961-NMSC-083, 68 N.M. 467, 362 P.2d 998 (N.M. Sup. Ct., July 18, 1960) (No. 6768). The brief in chief also reveals that after the basin was extended, the State Engineer actively engaged in stopping wells being drilled in the newly covered acreage. However, the State Engineer never attempted to stop the drilling of the Mendenhall's well except to require the driller to obtain an artesian well-driller's permit. *Mendenhall*, Brief in Chief, *supra*, at 4-5.

1. **The Effect of Shutting the Mine**

**{54}** Appellants argue that the closing of the Mine is not relevant to diligence because: (1) the subjective intent of a claimant is irrelevant; (2) the mining concept of "abandonment" has nothing to do with the diligent pursuit of water rights; and (3) the sale of the water rights after CFP left the scene is irrelevant.

**{55}** We disagree that subjective intent is an irrelevant inquiry. As we explained above, the primary focus of relation and its diligence factor is on the claimant's steady application of effort to the task of planning and executing a plan for the diversion and use of water. An appropriation must start with a bona fide intent to put water to use in a reasonable time. The claimant's attention to the tasks required necessarily invokes subjective intent, in particular, as here, when the work is completely interrupted. One can imagine a situation where a claimant did not care whether her work bore fruit and yet continued to pursue the work to conclusion. But it defies common sense and logic to attempt to ignore intent when the work is deliberately stopped by the claimant and the facilities built to carry on the work are not simply boarded up or put into "storage," but completely stripped from the project site and scattered around the world. Given that set of facts, the question must arise: what does the claimant intend to do now—let the storm pass and try again or give up the project entirely? A decision to pause and reassess followed by renewed efforts is a different matter from deciding to stop, leave, and never return. The former might be excused if the claimant returned and set to work again. But the latter can properly be seen as a fatal disruption of the "plan" required by *Mendenhall* and all other cases analyzing the doctrine of relation.

**{56}** We note that while Appellants argue that intent with regard to the shut down and liquidation is not relevant, they simultaneously argue that Frost & Gray's—and others'—intent to revive the Mine is relevant. Appellants cannot have it both ways. Intent is either relevant or it is not. We do not mean to imply that intent is generally dispositive. It is not. And we see no indication that the adjudication court saw or treated it as dispositive. It simply took it into account as part of its decisional process. We see no difficulty with using a totality of the circumstances approach to evaluating a case such as this.

**{57}** Next, Appellants quibble about the meaning of the term "abandonment" as used by the adjudication court in its findings of fact and conclusions of law. The adjudication court found as a matter of fact that "CFP abandoned its mining operation at Copper Flat" and that when CFP did so, "it abandoned its plans to develop the mine at Copper Flat." Appellants argue that the adjudication court erroneously adopted the mining term of art—"abandonment"—and applied it wholesale to the *Mendenhall* water rights context. We see no indication of that in the ruling below. The court did note that the Mine was labelled "Abandoned" in the Mine data retrieval system. But there is no indication that this fact was determinative to the adjudication court. The adjudication court also drew a distinction between the concept of "mothballing" a mining operation and "abandoning" one. Comparing the two terms, the court found that mothballing allowed a quick return to operation once favorable conditions for mining returned. The court decided that the Mine was not mothballed; it was abandoned and closed.

**{58}**   Considering the findings and conclusions of law as a whole, it is clear that the court used the term "abandonment" in the ordinary sense of giving up control of and interest in property coupled with a decision never to claim an interest again. Viewed in that light, the use of the term is appropriate and even compelled by the evidence. CFP and the Bank had no intent or desire to re-engage with the Mine project after they left. That circumstance cannot be ignored in evaluating the status of the unvested or inchoate water rights left "on the table" when they exited the scene.

**{59}**   Appellants' argument that sale of the water rights after CFP left is irrelevant simply ignores the reality of the factual and legal scenario in place when CFP and the Bank completed their exit. As noted above, there was in a real, everyday sense, no project in existence after CFP and the Bank liquidated the assets of the Mine and departed in 1987. The physical assets were gone or buried. The legal assets—water rights and mining permits—were held by different entities. The owner of the mining permits had no interest in operating the Mine or apparently even in marketing the property. Frost & Gray as the new owners of the water rights had no mining experience, or assets, or contacts sufficient to get the Mine operational again. Frost & Gray had dreams of turning a bargain purchase into a valuable right, but they did not have the means to accomplish that by themselves. This state of affairs supports the adjudication court's legal conclusion that the sale of the water rights to Frost & Gray severed the water from the Mine, and thus, in *Mendenhall* parlance, from the "plan." Severance of the water and the mining permits from the Mine supports the adjudication court's legal conclusion that "CFP's and CIBC's [the Bank's] actions extinguished any inchoate water rights under *Mendenhall*."

**{60}**   It is true, as Appellants argue, that the process of perfecting water rights does not have to be completed by the original appropriator. Rights in projects and plans can be assigned to others and, in an appropriate circumstance, the assignee can in effect make the efforts of their assignor their own. Appellants point to *Mendenhall* as an example. We have no quarrel with the assertion in the abstract, but neither can we ignore the factual circumstance in this case. To repeat, the facts here are unique; so unique that run-of-the-mill assignment cases such as *Mendenhall* offer little or no guidance. For example, the briefs in *Mendenhall* reveal that the Mendenhall defendants were partners in the entity that initiated the project involved there. They were successors in title only because the spouse of one of the partners passed away and the Mendenhalls had purchased the surviving spouses' and another partner's interest in the partnership. *Mendenhall*, Brief in Chief, *supra*, at 5. As such, the Mendenhalls were fully capable of completing the prebasin plan on their own. This is a far cry from the facts in this case. Under our facts, the ability of Frost & Gray to take on the mantle of CFP is, as a factual matter, exceedingly slight.

**{61}**   In sum, the adjudication court did not err in taking the circumstances surrounding the closing and abandonment of the Mine by CFP and the Bank into consideration as part of its decision-making process.

## 2.      The Transfer Applications

**{62}**    As noted above, prior to selling the water rights to Frost & Gray, CFP explored other avenues for marketing the water rights associated with the Mine. Having failed to sell the project as a working mine, and having been advised that the water rights might be worth millions of dollars, CFP and the Bank apparently began exploring sale of the water rights separate from the Mine as early as the spring of 1985. Counsel advised CFP and the Bank of the many potential issues involved in achieving a sale of the water rights, including the difficulties involved in and the potential effects of transferring the rights from the Mine to another location. With this information in hand, CFP and the Bank forged ahead and purportedly entered into an agreement with the New Mexico Office of the Commissioner of Public Lands to transfer the water rights to wells located near Las Cruces. The application for permission to transfer the rights was filed with the State Engineer on March 6, 1986. Apparently, nothing came of the purported sale to the Commissioner of Public Lands and no hearing on the transfer request was ever held. The request remained pending until Gray requested its withdrawal after Frost & Gray purchased the water rights in April 1987.

**{63}**    Appellants argue that it was improper for the adjudication court to take the transfer application into consideration given that it was never acted upon and was voluntarily withdrawn. As such, Appellants argue, it was a legal and practical nullity. We agree that the application became a legal nullity within the sphere of the State Engineer's administrative world. But that does not make it irrelevant to the question of whether CFP and the Bank intended to and did abandon the Mine, and thus, the project. The transfer application is another piece of evidence the adjudication court could take into account as part of the totality of circumstances it could draw on as it considered its decision. There is no indication that the court treated it as determinative. But it undeniably supports the court's legal conclusion that the transfer application was "inconsistent with [CFP's] pre[]basin plan and inconsistent with a diligent effort to pursue the pre[]basin plan under *Mendenhall.*" We perceive no error in the adjudication court's consideration or use of CFP's transfer application.

**{64}**    Appellants similarly argue that the transfer application filed by Frost & Gray in September 1988 was a legal nullity because it was never acted upon and was voluntarily withdrawn. This transfer application was filed as result of Frost & Gray's agreement to put the waters to recreation and irrigation purposes on the Ladder Ranch. Frost testified that he and Gray "fully intended to follow through on their obligations under this agreement." The transaction with the Ladder Ranch was presumably derailed when Hydro Resources asserted in its protest to the transfer application that the water rights actually belonged to Inspiration—the company that owned the mining permits and claims at Copper Flat. The conflict over title to whatever water rights existed was settled when Frost & Gray entered into their agreement with Gold Express to allow use of the water in exchange for shares in the company and cash payments.

**{65}**    Given this set of facts, we agree that Frost & Gray's transfer application was of less evidentiary value than that of CFP and the Bank. But it was not irrelevant to the issue of whether Frost & Gray themselves exercised diligence in pursuing the prebasin plan to mine copper. It is relevant to know that as early as 1989 they were prepared to

abandon their intent to find a partner to pursue the prebasin plan to restart mining operations. The transfer application was "inconsistent with CFP's pre[]basin plan." And, again, there is no indication that this evidence was determinative in the adjudication court's decision. It was part of the totality of circumstances the court considered. As such, we see no error in its use.

### 3.    The Role of Equity in Evaluating *Mendenhall* Claims

**{66}**    Appellants emphasize that the doctrine of relation is at bottom an equitable construct. As such they argue that courts should apply the doctrine in the usual manner, weighing the equities of the disputants in the controversy by determining the competing benefits and detriments likely to be felt by the parties as a result of their decision. Appellants assert that the objectors have not—perhaps cannot—show any detriment to their water interests if Appellants' *Mendenhall* rights are recognized. On the other hand, Appellants point out, they and the public would benefit greatly by allowing them to continue to develop their *Mendenhall* rights so they can get back to the business of mining copper. Appellants go so far as to assert that "if use of the doctrine would not injure any other water user, there is no legal basis for denying its application." While we agree that relation has equitable aspects, we conclude that this last assertion goes too far.

**{67}**    As we noted above, the early courts borrowed from the common law of property when they applied the doctrine of relation to the question of priority as they constructed the concept of prior appropriation. Kinney in his treatise provides as thorough a treatment of the history of relation and its application to the question of water rights as can be found. *See* 2 Kinney, *supra*, §§ 743-56, at 1284-1310. The effect of the doctrine is to protect the first person who in good faith undertakes to divert and use a source of water. But application of the doctrine is entirely dependent on the first appropriator's exercise of due diligence to finish the project and put the water to beneficial use within a reasonable time. *See* 2 Kinney, *supra*, § 750, at 1297-98; *Millheiser*, 1900-NMSC-012, ¶¶ 8, 30.

**{68}**    Thus, relation in this context is an equitable concept cabined by the requirements of prior appropriation. Meeting those requirements is paramount in the assessment of whether relation should be applied in favor of a claimant. Applying relation as suggested by Appellants would result in excusing a claimant's failure to exercise due diligence as so long as it could be argued that the delay was not harming any other water users. And the risk would be heightened in cases such as the one before us where there are no specific competing claimants. If, as Appellants assert, the objectors cannot prove any impairment to their water interests, they can be ignored without requiring Appellants to prove due diligence. That outcome would bend prior appropriation beyond recognition.

**{69}**    In addition, Appellants do not explain how or whether the idea of "no harm" applies to the State Engineer in his role as the plaintiff in stream and groundwater adjudication cases such as this. The State Engineer ostensibly represents the interests of the general public. The public—or the State Engineer—owns all waters within its

borders. We doubt that an argument can be persuasively made that in the context of a groundwater adjudication, a *Mendenhall* rights claim cannot be denied unless specific claimants can prove harm to their water interests. Would proof of a potential effect on all users in the basin because the basin is demonstrably over appropriated be relevant? Would such proof be sufficient in and of itself? Would the adjudication court be required to accept evidence of specific impairments? Would the court be required to accept evidence of the economic benefits of the unfinished project in order to weigh the equities?

**{70}** We do not decide these issues. Rather, we point them out to illustrate the difficulties posed by Appellants' broad invocation of equity principles in this context. It is enough to say that the equities in cases involving the doctrine of relation are entirely dependent on the exercise of diligence under the circumstances of each case. We turn to that issue now.

## 4.     The Diligence Requirement

## (a)     CFP and the Bank

**{71}** In its Conclusions of Law, the adjudication court decided that CFP and the Bank did not meet the *Mendenhall* requirements to diligently develop and put water to beneficial use in accordance with CFP's prebasin plan because they (1) stopped mining, (2) sold and moved all of the mining equipment from the site, and (3) attempted to sell—and finally did sell—the water rights in a manner that severed them from the mining operation. To that list, we would add that they returned the land leases and mining permits to Inspiration and gave notice to BLM and the State Engineer that the "Copper Flat Property is permanently closed and will not be restarted."[2] The adjudication court concluded that CFP's and the Bank's actions "extinguished any inchoate water rights under *Mendenhall.*"

**{72}** Appellants argue that the adjudication court failed to properly take into account the logistical and economic factors which led to the closure, including the world-wide, persistent drop in copper prices. Appellants assert that the periods when the Mine was out of operation for economic reasons should not count against the exercise of diligence. We agree that the "unique character of extractive industries" and the environment they operate in are part of the calculus courts should take into account when assessing diligence. As we noted above, the doctrine of relation has always recognized that each case should be judged based on its own circumstances.

**{73}** Reviewing the record below, we see no indication that the adjudication court failed or refused to consider the effects of copper prices on CFP's and the Bank's ability to operate the Mine. The adjudication court noted the drop in prices in 1982 and CFP's attempts to keep the Mine afloat and attract new investors and buyers. The adjudication

---

[2] Appellants assert that these actions were not volitional on CFP's part, but were rather forced on it by the Bank. This argument is beside the point. As the lender on the project, the Bank had the right to step in upon CFP's default and "take over" the project. Its acts at that point were the acts of the project and CFP.

court specifically found that when "CFP ceased operations . . . in June 1982, [it] hoped and expected that the [M]ine would reopen if (1) an investor could be identified . . . and (2) the global price of copper would increase[.]" There is no indication that the adjudication court penalized CFP and the Bank for the delay from 1982 to early 1986. But, recognition of difficult economic circumstances does not compel a finding in favor of Appellants. CFP and the Bank demonstrably lost all hope and expectations when they divested themselves of all interest in the project. The adjudication court could appropriately conclude—as it did—that their prebasin plan was at an end when they ceded the field and left.

{74}    Nonetheless, Appellants argue that the sale of the water rights to Frost & Gray should be viewed as simply a continuation of the plan. Under different circumstances that argument might be persuasive. But under the facts presented in this case the assertion is not plausible. The "facts on the ground" after CFP and the Bank left the scene are described above. Those facts belie any reasonable interpretation other than that CFP's and the Bank's prebasin plan to mine copper was simply a ruin. The elements of their plan—land leases, mining permits, equipment, and water—were scattered to the winds. CFP and the Bank did not purport to be selling a mining project to Frost & Gray. All CFP quitclaimed was "inchoate and beneficially used water rights . . . with respect to which rights [CFP] has applied for a permit to change the location of the wells and permit to change the place and purpose of use of [the] water rights." The sale of the water to Frost & Gray was not an attempt by CFP and the Bank to continue with or salvage the project. It was the last step in exiting a failed venture.

{75}    Frost & Gray may have had a preference for marketing the water to other miners, but when they purchased CFP's interests in the water at Copper Flat they did not have the means to make their preference a reality. In the abstract, we have no quarrel with the assertion that Frost & Gray could do the work of putting the water to use through agents. But the prospects of that were vanishingly thin in 1987. Thus, we agree with the adjudication court that sale of the water rights to Frost & Gray severed the water from the prebasin plan.

{76}    Given the reality of the situation in early 1987, it was within the adjudication court's reasonable range of decision-making to hold that CFP's *Mendenhall* rights were extinguished. We agree with its conclusion.

{77}    The adjudication court could have stopped its analysis there. After deciding that the *Mendenhall* right was extinguished, the adjudication court could have concluded that Frost & Gray's efforts were simply irrelevant to any *Mendenhall* analysis. But the adjudication court did not choose that path. It considered Appellants' argument that they had been diligent in pursuing CFP's prebasin plan on the merits and ruled against them. The adjudication court concluded that Frost & Gray "did not meet the *Mendenhall* requirements because they did not diligently develop water in accordance with CFP's pre[]basin plan." Separately, the adjudication court concluded that "[e]fforts by subsequent entities seeking to restart mining operations at Copper Flat did not

constitute diligence for purposes of the *Mendenhall* rule." We consider those rulings now.

**(b)     Frost & Gray and Their Contractors**

**{78}**     The adjudication court did not elaborate on the basis for its decision to address Appellants' arguments after it concluded that CFP's and the Bank's action "extinguished any inchoate water rights under *Mendenhall.*" Thus, we do not know if the adjudication court considered Appellants' efforts somehow a continuation of CFP's work, or if it viewed their efforts as a specie of resurrection—a kind of phoenix rising from the ashes. We conclude that it is not necessary to resolve the conundrum. Frost & Gray have little or no basis to take credit for any effort and expense CFP and its predecessors put into the Mine. But, the case involves the same water claims initiated to extract copper from the same ore body. We conclude that the doctrine of relation as a legal fiction is broad and flexible enough to cover a connection as tenuous as that between CFP and those who came after it pursuing the same goal. Given the facts on the ground, however, the analysis at this point should focus on Frost & Gray's and their partners' efforts.

**{79}**     We provided a detailed timeline of events in the factual summary above. We will summarize it rather than repeat it in detail. After buying CFP's water rights in April 1987, Frost & Gray did essentially nothing to market the water to potential mining companies. Concerned that they might lose the rights for lack of use, in September 1988, they entered into an agreement with the neighboring Ladder Ranch to use the water for agricultural and recreational purposes. As part of the agreement with the Ladder Ranch they filed an application with the State Engineer to change the point of diversion and place and purpose of use for the water. Though they hoped to engender some interest from mining companies, they were ready to complete the transaction with the Ladder Ranch if none was forthcoming.

**{80}**     The application prompted an objection from Hydro Resources based on grounds not relevant here. The legal process before the State Engineer revealed a competing claim to ownership of the CFP water rights. The ownership dispute simmered in the background of the application process for a period of two years until Frost & Gray entered into an agreement with Gold Express settling the matter and allowing Gold Express to use the water rights in exchange for stock and cash payments to Frost & Gray.

**{81}**     Gold Express was in control of the mining permits at Copper Flat from April 1990 to sometime in 1994. In January 1991, Gold Express filed a plan of operation for Copper Flat proposing to rebuild the facility as it existed in 1986. The record does not reflect any activity by Gold Express on the ground at Copper Flat nor much activity in any vein. Gold Express did not put any water to use on the property. Gold Express quitclaimed whatever interest it might have in the CFP water right to Alta Gold in November 1993.

**{82}**     Alta Gold took over from Gold Express in May 1994. Alta Gold's plan of operation was similar to CFP's, and it intended to recover and reuse the salvageable

infrastructure left by CFP. Most of Alta Gold's efforts centered on permitting requirements, including an EIS and the mine operating permit. It did make some efforts to acquire a mill and began leasing haul trucks in 1999 in anticipation of issuance of the final EIS. The record does not reflect the status of the mine operating permit at that point.

**{83}** All of Alta Gold's efforts came to a halt when it was forced into bankruptcy as a result of the failure of other gold mining ventures. Alta Gold claimed ownership of the water rights in the bankruptcy proceeding. The bankruptcy court recognized Frost & Gray's ownership of the water rights in December 2000. Alta Gold never returned to Copper Flat. Alta Gold never did any material work on the ground at Copper Flat and never put any water to beneficial use.

**{84}** Thus, Frost & Gray's first two mining contractors were simply not successful in furthering the prebasin plan over a period of ten years. By the time they left the scene, no activity had occurred on the site and no new water had been put to beneficial use for eighteen years.

**{85}** In January 2001, Hydro Resources filed suit in the district court seeking to quiet title to the water in itself as a successor to Inspiration. The suit wended its way through the courts for seven years, ending when our Supreme Court decided the case in Frost & Gray's favor. *Hydro Res. Corp.*, 2007-NMSC-061, ¶¶ 47-48. A quiet title decree was entered in favor of Frost & Gray in January 2008. Unlike their previous dealings with entities claiming an ownership interest in the water, the record shows that Frost & Gray did not attempt to settle or otherwise make an arrangement for use of the water with Hydro Resources.

**{86}** After the suit with Hydro Resources, Frost & Gray unsuccessfully offered the water to one mining company and unsuccessfully responded to an inquiry from another. In September 2010, "Frost & Gray entered into an option agreement with NMCC for the sale of the declared water rights. At the time of trial, there remained conditions precedent to the transfer of ownership of the rights to NMCC."

**{87}** NMCC entered into an option agreement with Hydro Resources to purchase Copper Flat and the associated mineral claims in July 2009. Since its entry onto the site, NMCC has done some actual work on the ground, including inspection of the water lines and exposing CFP's plant foundations. Both appear to be in good condition and usable. NMCC plans to recreate the CFP process. NMCC had started the permit application process as of the time of the trial. The record does not reveal that NMCC put any new water to beneficial use on the site.

**{88}** In February 2012, NMCC filed an Application for Permit to Repair and/or Deepen Well for the four production wells and five supplemental wells. The State Engineer partially approved and partially denied the application, allowing deepening and repair but limiting usage to the 888.783 acre-feet per year put to use when the Mine was operated. The State Engineer denied the prebasin claim of 6,462 acre-feet per year

intended but never put to use. NMCC aggrieved the partial approval, and the matter is pending but currently stayed.

**{89}** The adjudication court concluded that these collective activities did not constitute diligence as required by *Mendenhall.* We agree. We address Frost & Gray's efforts first.

**{90}** Frost & Gray's personal efforts to get the Mine back on track were minimal. This is not surprising given their lack of resources and total lack of mining experience or contacts within the mining community. And there is nothing in the record to indicate that they sought help from others who might be able to market the water to potential mining partners. Their first venture in arranging to use the water was to separate it from its original use and from its original source point. If the sale to the Ladder Ranch did not elicit interest from mining companies, they were fully prepared to fulfill their obligations to the Ladder Ranch and entirely forgo the notion of using the water for mining. They did not actively seek partners except for the one letter sent in 2009. Rather, they passively waited for mining companies to approach them. Again, this is not surprising given their lack of contacts with the mining community. Frost & Gray did less than CFP and the Bank did to get the project going as envisioned in the prebasin plan. Frost & Gray's activity cannot reasonably be deemed to be "that constancy or steadiness of purpose or labor which is usual with men engaged in like enterprises, and who desire a speedy accomplishment of their designs[.]" *Ophir Silver Mining Co.*, 4 Nev. at 546.

**{91}** Relying on *Rio Rancho Estates, Inc.*, 1981-NMSC-017, ¶ 13, Appellants assert that the requirement of diligence and application to beneficial use may be held in abeyance or tolled where litigation interrupts development. Appellants read the case too broadly. In *Rio Rancho Estates, Inc.*, the state engineer refused to allow the city to enlarge its wells and increase the amount of water it could pump. As such, the state engineer's order prevented the city from developing its water in accordance with its prebasin plan. That is the context in which the Court noted that diligence and application to use "may be held in abeyance . . . in cases such as the present one where litigation over a *Mendenhall* right interrupts development." *Id.* The suit between Frost & Gray and Hydro Resources was not "litigation over a *Mendenhall* right." *Id.* The state engineer's order in *Rio Rancho Estates, Inc.* stopped work on the wells. The litigation with Hydro Resources did not in and of itself stop any work on the project.

**{92}** Frost & Gray were entirely dependent on others to do the actual work of restarting the Mine, and we turn to examine their efforts now. Gold Express was the first contractor that purported to have mining experience. The record is sparse with regard to its activities. So far as we can tell, its only activity was to file a plan of action with BLM. Beyond that there is no evidence that it did anything to help get the Mine back in business. Even Appellants' requested findings of fact do not reveal any other relevant activity by Gold Express.

**{93}** Alta Gold was Frost & Gray's second contractor. As noted above, it focused its attention on permitting and regulatory issues. It also started work on finding a mill and other equipment as issuance of the final EIS neared. Nothing came of its efforts

however because it was forced into bankruptcy before anything occurred on the ground at the Mine site.

**{94}**    These two contractors were in control of the site for about ten years. One accomplished nothing of note. The second showed more useful effort, but all for naught. We note that for the better part of the 1990s the price of copper was up sufficiently to make mining operations viable. We acknowledge that mining could not occur until the regulatory hurdles were cleared. Had Alta Gold not gone into bankruptcy, had the final EIS been issued as expected, and had the mining activity been undertaken soon thereafter, we would be more likely to conclude that the time lapse was reasonable under the circumstances. At that point, eighteen years would have elapsed from the last time water had been put to use at the Mine. But the price of copper had been depressed for perhaps forty percent of the period and regulatory requirements progressed slowly.

**{95}**    The bankruptcy destroyed all progress to that point. How should the bankruptcy be taken into account? We conclude that it must be weighed against a finding of diligence. The bankruptcy was not caused by conditions at the Mine or in the copper market. It was caused by other ventures Alta Gold was involved with. There is no reason from a policy standpoint to hold that a claimant's lack of fiscal capability is simply irrelevant to the question of diligence. Claimants who want to pursue projects as expensive as copper mining should be expected to have sufficient resources available to them to at least weather downturns not connected directly to the copper mining venture. This is particularly apropos here where the parties who own the water sought to be developed cannot themselves provide any resources to the project. We need not rely on the specific holding in *Rio Puerco Irrigation Co.*, 1914-NMSC-041, to place the onus of the bankruptcy on Appellants. In this unique factual setting, it simply makes sense. Otherwise, the interests of other potential claimants and—most importantly—the interests of the State Engineer in controlling waters in over appropriated basins could be inappropriately frustrated by impecunious claimants.

**{96}**    Alta Gold's bankruptcy was followed by twelve more years of no progress. By the time Frost & Gray were approached by NMCC, thirty years had elapsed since water had last been put to use at the Mine and forty years had elapsed since the project had begun by the almost forgotten Quintana Minerals entity. In that time the price of copper had been high enough to support mining for more time than it had been depressed.

**{97}**    Under the doctrine of relation, it was Appellants' obligation to put water to beneficial use within a reasonable time, all circumstances considered. Appellants simply failed to do so. We agree with the adjudication court's conclusion that this failure "extinguished under *Mendenhall* any inchoate rights they may have owned." We further conclude that Appellants' *Mendenhall* rights were extinguished before NMCC appeared on the scene.

**{98}**    In so holding we have taken full account of the economic, regulatory, and legal obstacles faced by Frost & Gray and their contractors. We have no quarrel with Appellants' assertion that they are relevant to the diligence analysis under the doctrine

of relation. But under the facts of this case, they are not sufficient to excuse the delay in putting the claimed water to beneficial use.

## D. The Adjudication Court Erred in Finding Abandonment With Regard to Wells Used for the Mine

**{99}** Appellants challenge the adjudication court's conclusion that they abandoned their interests in the so-called Miscellaneous wells. We agree and reverse and remand for further consideration with regard to whatever vested interests Appellants may have in water put to use from the Miscellaneous wells prior to declaration of the basin. Our conclusion concerning *Mendenhall* rights apply in full force to whatever inchoate rights Appellants claimed for the Miscellaneous wells.

**{100}** We decide this issue on two bases: (1) the adjudication court did not enter any findings concerning Appellants' intent to abandon rights in the Miscellaneous wells; and (2) its ruling is incompatible with its decision that Appellants did not abandon their rights in the production wells. A failure to address intent to abandon would be excusable if the evidence at trial was such that the adjudication court could rely solely on the presumption that arises based on long periods of nonuse. *See State ex rel. Reynolds v. S. Springs Co.*, 1969-NMSC-023, ¶¶ 7, 18-19, 80 N.M. 144, 452 P.2d 478. But that is not the case here. Appellants did offer evidence concerning the conditions that prevented them from using the water for so many years, and they offered evidence that they did not intend to abandon any of their water rights. The adjudication court accepted that same evidence to conclude that "[t]he economic, financial, and logistical difficulties of CFP and the legal challenges of Frost and Gray excuse the long period of nonuse of the vested water rights." Appellants are correct that there is no distinction to be made between the vested rights associated with the production wells and the vested rights associated with the Miscellaneous wells.

**{101}** We note that the adjudication court did not make any findings concerning vested versus inchoate rights in connection with the Miscellaneous wells. On remand, the adjudication court should determine the extent of Appellants' vested rights—if any—tied to the Miscellaneous wells.

## IV. The Cross Appeal

## A. Abandonment

**{102}** Turner and Hillsboro cadre assert that the adjudication court erred in concluding that Frost & Gray and CFP did not abandon their vested rights in the water attributable to the production wells and the open pit. Neither Turner nor Hillsboro cadre challenge the facts found by the adjudication court. But they offer interpretations of the law of abandonment which, if accepted, would narrow the kind of evidence adjudication courts could take into account in making their decisions. Ultimately, we reject their arguments, but it would be useful to review the concept of abandonment of vested water rights before we explain why.

**{103}** The possibility of losing a vested interest in water flows from the theory of prior appropriation. Under the doctrine of prior appropriation all waters belong to the public. The right of an appropriator to take water is based on the actual diversion of water and its application to a beneficial use. A water right is a usufructuary right to use the water, and not a fee interest such as one can have in real estate. The right to continue using water depends on the continued use of the water. A vested right to water can be lost by "abandonment or nonuser." *See generally*, Joseph R. Long, *A Treatise on the Law of Irrigation*, § 180, at 326-28 (2d ed. 1916). Long drew a sharp distinction between "abandonment" and "nonuser." He saw abandonment as a conscious deliberative act. In the case of an "actual" abandonment, time lapse was immaterial and the right was extinguished as soon as the abandonment was complete. In the case of a "mere nonuser," time lapse is of prime—though not sole—importance. Long, *supra*, § 181, at 328-29. The distinction is of little practical importance from a litigation standpoint. Very few appropriators explicitly abandon their rights; and, if they do, the act likely will not end up in the courts. The vast majority of litigated cases involve "mere nonusers" with the predictable myriad of factual scenarios.

**{104}** The hard question in each case is whether the evidence is enough to prove abandonment. For Long, the difficulty was "one of proof merely, for the general doctrine as to what constitutes abandonment is well settled." Long, *supra*, § 183, at 330. Abandonment requires the confluence of both intention and act. "Mere nonuser is not in itself an abandonment[.] . . . The intention of the party is always a controlling consideration[.]" Long, *supra*, at 330-31; *see also* 1 Samuel C. Wiel, *Water Rights in the Western States*, §§ 567-69, at 604-11 (3d ed. 1911). Nonuse is competent evidence on the question of abandonment and if continued for an unreasonable period of time may create a presumption of intention to abandon, though this presumption is not conclusive. *See* Long, *supra*, § 183, at 330; 1 Wiel, *supra*, § 569, at 608. Moreover, because the matter involves questions of subjective intent, the question is "peculiarly within the province of a trial court to determine from all the facts and circumstances of each particular case whether abandonment has or has not taken place." *Cooper v. Shannon*, 85 P. 175, 103 (Colo. 1906); *see* 1 Wiel, *supra*, § 567, at 604. Finally, because involuntary losses of vested rights are not favored, the burden is placed on the party asserting abandonment to provide proof by clear and convincing evidence. Long, *supra*, § 185, at 335.

**{105}** Though ancient in some senses, the treatment of the subject in these treatises— and the many cases they cite—accurately states the gist of the concept of forfeitures as it is applied today. Robison & Tarlock's treatise also notes that "[n]on-use alone is insufficient for abandonment." *See* Robison & Tarlock, *supra*, § 5:91, at 396-97; *see also Klamert v. Iverson*, 2019 MT 110, ¶ 14, 395 Mont. 420, 443 P.3d 379 ("A finding of abandonment requires both nonuse and intent to abandon."); *Gilbert v. Smith*, 552 P.2d

1220, 1223 (Idaho 1976) (holding that fifty-three years of nonuse did not constitute abandonment per se).[3]

**{106}** New Mexico came later to the consideration of abandonment in this area, and its jurisprudence is not different from the general ideas discussed above. For example, in *Chavez v. Gutierrez*, 1950-NMSC-004, ¶ 8, 54 N.M. 76, 213 P.2d 597, the Court agreed that abandonment would not lie if the failure to use the water was due to conditions beyond the user's control. In that case, prolonged drought produced a shortage of water. *See N.M. Prods. Co. v. N.M. Power Co.*, 1937-NMSC-048, ¶ 22, 42 N.M. 311, 77 P.2d 634 (holding that the user could not be held to have intended to not use water when it did not reach its ditch because all of the water had been diverted upstream).

**{107}** The Court provided its first detailed treatment of abandonment in *South Springs Co.*, 1969-NMSC-023, even though the case actually turned on the application of a forfeiture statute. The statute—NMSA 1978, § 72-5-28(A) (2002)—provided that failure to use water for a period of four years would result in reversion of the water to the public, unless the nonuse was caused by "circumstances beyond the control of the owner." *S. Springs Co.*, 1969-NMSC-023, ¶¶ 3, 18 (internal quotation marks and citation omitted). In *South Springs Co.*, the water user had a decreed right to irrigate 317 acres from the South Springs River "so long as it was available in quantities sufficient for irrigation purposes." *Id.* ¶ 2. The river began to fail, and by 1933 there was not enough water to irrigate. The owners had not used water on the land since 1933—a period of thirty-six years by the time of the opinion. Neither had they done any maintenance on the ditches or canals during that time. In fact, roads and houses had been built over some of the ditches. *See id.* ¶ 8.

**{108}** The district court ruled that the owner had "abandoned or forfeited their water rights by nonuse by reason of their failure to undertake any diligent efforts to obtain the use of underground water for the subject lands since 1933." *Id.* ¶ 4. Our Supreme Court affirmed using a bifurcated analysis. It ruled that the four-year forfeiture provision of the statute applied, and, thus, the users had forfeited their water rights. *See id.* ¶ 11. To analyze the forgiveness proviso in the statute, the Court relied on abandonment case law, citing Kinney's work for the outlines of the analysis. *See id.* ¶¶ 7, 9. In doing so the Court was careful to recognize the distinction between forfeiture and abandonment, noting that the latter required proof of intent. *See id.* ¶ 10. Relying on Colorado cases, the Court also recognized and applied the concept that long periods of nonuse could give rise to a presumption of abandonment, which then required the user to offer evidence of "some fact or condition excusing such nonuse." *Id.* ¶ 22 (quoting *Commonwealth Irrigation Co. v. Rio Grande Canal Water Users' Ass'n*, 45 P.2d 622, 623 (Colo. 1935)). The "fact or condition" could not be "merely expressions of desire or hope or intent[.]" *Id.* ¶ 21 (quoting *Mason v. Hills Land & Cattle Co.*, 204 P.2d 153, 155). Applying these threads of analysis in light of the statutory provision, the Court ultimately ruled that the user's failure to take any action to move their diversion point from the

---

[3]We note that the term "abandonment" in this context is a term of art with its own distinctive features and requirements. It should not be mistaken for or intermingled with the term as used in the discussion concerning diligence and relation above.

disappeared surface to its underground source was not excusable. *See id.* ¶ 23; *accord State ex rel. Office of State Eng'r v. Elephant Butte Irrigation Dist.*, 2012-NMCA-090, 287 P.3d 324.

**{109}** New Mexico has not had occasion to consider what type of evidence is sufficient to meet the presumption of abandonment in the absence of a statutory influence. Turner and Hillsboro cadre offer different perspectives on this issue, and we now turn to their arguments.

**{110}** Turner argues that Appellants were required to offer evidence of excuses for nonuse that were beyond the control of Frost & Gray, their contract partners, and Hydro Resources. Turner relies on *South Springs Co.* to some degree and on the general idea that financial inability is not a sufficient excuse to overcome a presumption of abandonment (citing *Rio Puerco Irrigation Co.*, 1914-NMSC-041, and *In re CF & I Steel Corp. in Las Animas Cnty.*, 515 P.2d 456 (Colo. 1973) (en banc)). These cases do not support Turner's position. We have already discussed the procedural and legal posture of *South Springs Co.* It was decided under a forfeiture statute that required a finding of circumstances beyond the control of the owner to escape forfeiture. 1969-NMSC-023, ¶ 3. *South Springs Co.* did not lay down a general rule of abandonment. *Rio Puerco Irrigation Co.* also involved a statute that required a finding of causes beyond the control of the applicant. *See* 1914-NMSC-041, ¶ 4. In addition, *Rio Puerco Irrigation Co.* involved issues of initial appropriation and the doctrine of relation, not abandonment of vested rights.

**{111}** More importantly, the case law in the other western states does not support Turner's position. Appellants cite a representative case from Montana, *Heavirland v. State*, 2013 MT 313, 372 Mont. 300, 311 P.3d 313. A fuller spectrum of factual situations is found in the Colorado cases. As catalogued in *East Twin Lakes Ditches & Water Works, Inc. v. Board of County Commissioners of Lake County*, 76 P.3d 918 (Colo. 2003), the factors the Colorado courts have considered as indicative of an intent not to abandon a water right include: "(1) repair and maintenance of structures; (2) attempts to put the water to beneficial use; (3) active diversion records and non-appearance of the water right on the [s]tate [e]ngineer's abandonment list; (4) diligent efforts to sell the water right[s]; (5) filing documents to protect, change, or preserve the right; (6) leasing the water right; and (7) economic or legal obstacles to exercising the water right." *Id.* at 922 (citations omitted). None of the factors is deemed conclusive but they may be enough to rebut the presumption of abandonment. "On the other hand, if these factors are insufficient or nonexistent, only then is the failure to put the water to a beneficial use enough by itself to sustain a finding of abandonment." *Id.*

**{112}** The pattern that emerges from Colorado's cases is that abandonment will be found if the user can be said to have done nothing to use water or protect facilities over extended periods of time. In *CF & I Steel Corp.*, the user shut down a well in 1918, and by the time of trial had done nothing to maintain the well or make arrangements for alternate uses for the water for fifty-four years. 515 P.2d at 458. In that regard, the court in *CF & I Steel Corp.* drew a sharp distinction with the facts in *Hallenbeck v. Granby*

*Ditch & Reservoir Co.*, 420 P.2d 419 (Colo. 1966) (en banc), where, because the user made continuous efforts to maintain facilities and continue using water, the court found that "reasonable justification for non-use may very well exist where it can be shown that economic, financial, or legal difficulties . . . prevented the storing of all the water that was originally decreed." *Id.* at 426; *see also Se. Colo. Water Conservatory Dist. v. Twin Lakes Assocs., Inc.*, 770 P.2d 1231, 1243 (Colo. 1989) (en banc) (holding that abandonment was proven where users had done nothing to preserve facilities or redeem its land from tax sales for a period of seventy-four years).

**{113}** We agree with Colorado's approach to the issue. We also agree with Appellants that the facts in *Public Utility District v. State Department of Ecology*, 51 P.3d 744 (Wash. 2002) (en banc), with regard to the efforts by the user there to put water back to beneficial use, are closely analogous and support their position.

**{114}** Hillsboro cadre's argument is of a different order. Hillsboro cadre seeks to remake the law in New Mexico by melding our forfeiture statute with the concept of abandonment. It argues that the adjudicative court "erroneously dismissed forfeiture as not pertinent to the case through a narrow reading of the statute." Somehow incorporating the forfeiture statute into the analysis, Hillsboro cadre argues that Frost & Gray's water rights were "presumptively forfeited in 1991 following four years of nonuse of the water." Hillsboro cadre's argument ignores the settled historical view of the difference between forfeiture and abandonment. We have already detailed the policy and doctrinal roots of the distinction. Our Supreme Court went so far as to "regret that forfeiture and abandonment had been used interchangeably" in its prior opinions. *S. Springs Co.*, 1969-NMSC-023, ¶ 10.

**{115}** More importantly, Hillsboro cadre's argument ignores the plain language of our forfeiture statute. The statute provides in pertinent part:

> When for a period of four years the owner of a water right . . . has failed to apply them to the use for which . . . the right has vested, . . . the water rights shall be, if the failure to beneficially use the water persists one year after notice and declaration of nonuser given by the state engineer, forfeited . . . ; provided that the condition of notice and declaration of nonuser shall not apply to water that has reverted to the public by operation of law prior to June 1, 1965.

NMSA 1978, § 72-12-8(A) (2002). As is the norm, New Mexico adheres to the interpretive canon that the text of a statute is the primary source of its meaning. If a statute contains language that is "clear and unambiguous, we must give effect to that language and refrain from further interpretation." *See Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 37, 147 N.M. 583, 227 P.3d 73 (internal quotation marks and citation omitted). The language of the forfeiture statute is clear. Forfeiture of a water right under the statute can only happen if the State Engineer has given notice of "nonuser" and the water has not been put to use for a period of one year after such notice. Notice was

never issued to Appellants by the State Engineer, thus the statute does not apply to this case.

**{116}** To accept Hillsboro cadre's argument, we would have to find an unspoken intent on the part of the Legislature to overturn 150 years of accepted common law. To pose such a result is to refute it. Not only would it do violence to the clear mandate of the statute, it would—as Appellants note—defeat the statute's purpose to fix a time certain for loss of water after notice.

**{117}** Having rejected Turner's and Hillsboro cadre's legal arguments, we are left with determining whether the adjudication court's conclusions of law that Appellants' failure to use their vested rights was excused by the circumstances they faced and that Turner and Hillsboro cadre did not prove abandonment by clear and convincing evidence are supported by the facts. Turner and Hillsboro cadre did not challenge any of the adjudication court's findings of fact. In reviewing a record, "[w]e indulge every presumption in favor of the correctness of the findings, conclusions, and judgment of the district court." *See Sanchez v. Saylor*, 2000-NMCA-099, ¶ 12, 129 N.M. 742, 13 P.3d 960. At this point in this opinion, there is no need to survey the record and evidence again. The record is clear about what Appellants did and what they did not do. However haltingly, Frost & Gray sought to revive the Mine and protect the vested rights they purchased from CFP. Their efforts and those of their mining contractors fit within the board contours of the seven factors recognized by in *East Twin Lakes* cited above. To the extent Turner and Hillsboro cadre argue the facts at all, their arguments are simply requests for us to reweigh the evidence. In particular, most of Turner's factual arguments are based on the assertion that Frost & Gray were "speculators." The difficulty is that the adjudication court refused to find that they were. We are in no position to disagree.

## B.    The Open Pit

**{118}** The adjudication court found that the open pit—LRG-4652-S-17—evaporated at the rate of 34.45 acre-feet per year and awarded NMCC the same amount of water to be used for dust control with a priority date of December 10, 1975. Turner argues that there is no evidence to support the conclusion that the evaporative loss is equal to the amount of water used for dust control given that the adjudication court did not determine the amount water used for dust control. Turner also questions whether evaporative loss can be reclassified as dust control when determining the purpose of use. In addition, Turner challenges the December 1975 priority date, noting that water from the pit that did not exist could not have been used until 1982 when mining activity occurred. Hillsboro cadre also notes that there is no evidence in the record indicating how much water was actually used for dust control.

**{119}** New Mexico Copper counters that there is support in the record for the amount of water used for dust control from the pit. It relies on a general narrative—NMCC Exhibit 35—describing how water usage was calculated in 1982 by CFP personnel. Performing its calculations in its answer brief, NMCC arrives at a usage rate of 32.26 acre-feet per

year for dust control water derived from the open pit. The difficulty is that there is no indication that any of this evidence was presented to the adjudication court in this format. So far as the record reveals, New Mexico Copper relied on the declaration filed with the State Engineer for its claim for the open pit. The adjudication court noted that the declaration provided no information as to how the claimed usage or total water claim was calculated. And, Appellants did not request a specific finding of fact detailing the amount of water actually put to use for dust control from the pit.

**{120}** As such, we agree that there is no substantial evidence supporting the finding of 34.45 acre-feet per year for dust control as measured by evaporative loss. We reverse this portion of the judgment in favor of New Mexico Copper. Because we are not certain about the basis for the adjudication court's decision, we remand to allow the adjudication court to clarify its ruling on this point.

**{121}** We find no error in the ruling that the priority date for the vested water right—if the court in the end determines there is one—should be December 10, 1975. Use of the water at whatever rate for dust control is clearly part of the mining process. As such, any water developed and used for the project is appropriately given a priority date equal to the start of the project under the doctrine of relation.

## V.     Conclusion

**{122}** We affirm the adjudication court's ruling in favor of Frost & Gray granting them 861.84 acre-feet per year from the production wells with a priority date of December 10, 1975. We reverse the adjudication court's ruling refusing to recognize any vested rights in the Miscellaneous wells and remand for reconsideration in light of our ruling. We affirm the adjudication court's decision that the Appellants have no *Mendenhall* rights. We affirm the adjudication court's decision that Appellants have not abandoned their vested rights. We reverse the adjudication court's ruling granting New Mexico Copper 34.45 acre-feet per year from the open pit for dust control and remand for reconsideration in light of our ruling. The parties will bear their own costs.

**{123}  IT IS SO ORDERED.**

**MICHAEL D. BUSTAMANTE,**
**Judge Pro Tempore**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**RICHARD C. BOSSON, Judge Pro Tempore**

**APPENDIX**

**FINDINGS OF FACT**

**The Four Production Wells**

172.   LRG-4652, LRG-4652-S; LRG-4652-S-2; and LRG-4652-S-3:

a.   LRG-4652 and LRG-4652-S were drilled in December 1975, LRG-4652-S-2 was drilled in January 1976, and LRG-4652-S-3 was drilled in 1980.

**The Miscellaneous Wells**

173.   LRG-4652-S-4:

a.   LRG-4652-S-4 was drilled in 1931 for placer mining and used for that purpose until 1943. The well was used only for watering livestock from 1943 to 1980.

174.   LRG-4652-S-5:

a.   LRG-4652-S-5 was drilled in 1931 for placer mining and used for that purpose until 1943. The well was not used from 1943 to 1982. For about seven months, the well was again used for placer mining from September 1, 1982 to April 20, 1983.

175.   LRG-4652-S-6

a.   LRG-4652-S-6 was drilled in 1931 for placer mining and used for that purpose until 1943. The well was not used from 1943 to 1963. The well was used for placer mining again from 1963 to 1964, was not in use from 1964 to 1975, and was again used for placer mining from 1975 to 1984.

176.   LRG-4652-S-7

a.   LRG-4652-S-7 was drilled in 1932 for placer mining and used for that purpose until 1943. The well was next used to water stock from 1943 to 1975 and was used for domestic purposes from 1975 to 1980.

177.   LRG-4652-S-8

a.   LRG-4652-S-8 was drilled in 1932 for placer mining and used for that purpose until 1943. The well was next used to water stock and for domestic purposes from 1943 to 1984 and has a perfected prebasin water right of 3 [acre-feet per annum] for domestic and stock watering purposes.

178.   LRG-4652-S-9

a.   LRG-4652-S-9 was drilled in 1971 to explore for adequate water for Copper Flat, and it cannot be determined if the well was used between 1972 and

1974. From 1974 to 1978, the well was in use for unknown purposes. From 1978 to 1980, there was little or no use of the well. The well pumped approximately 22,922,500 gallons of water (70.35 [acre-feet per annum]) for a construction project from October 1980 to March 1982.

179.   LRG-4652-S-10

a.      LRG-4652-S-10 was drilled in 1972 to explore for adequate water for Copper Flat, and it cannot be determined if the well was used between 1972 and 1974. From 1974 to 1978, the well was used for placer mining. From 1978 to 1980, there was little or no use of the well. The well pumped approximately 18,000,000 gallons of water (55.24 [acre-feet per annum]) for a construction project from October 1980 to March 1982.

**The Monitoring Wells**

180.   LRG-4652-S-11

a.      LRG-4652-S-1 l was drilled in December 1974, with a capacity of 20 gpm, with 32 [acre-feet per annum] available for "standby use for mining, milling, and reclamation purposes, to supplement supply" from the production wells.

181.   LRG-4652-S-12

a.      LRG-4652-S-12 was drilled in April 1975, with a capacity of 106 gpm, equipped with a cylinder pump powered by a windmill. The 1984 declaration claimed 171 [acre-feet per annum] available for "standby use for mining, milling, and reclamation purposes, to supplement supply" from the production wells, and 3 [acre-feet per year] "since 1982 for stock watering."

182.   LRG-4652-S-13

a.      LRG-4652-S-13 was drilled on May 12, 1975, with a capacity of 97 gpm. The 1984 declaration claimed 156 [acre-feet per year] available for "standby use for mining, milling, and reclamation purposes, to supplement supply" from the production wells.

183.   LRG-4652-S-14

a.      LRG-4652-S-14 was drilled on August 22, 1975, with a capacity of 262 gpm. The 1984 declaration claimed 423 [acre-feet per year] available for "standby use for mining, milling, and reclamation purposes, to supplement supply" from the production wells.

184.   LRG-4652-S-15

a.      LRG-4652-S-15 was drilled on September 22, 1975, with a capacity of 208 gpm. The 1984 declaration claimed 336 [acre-feet per year] 59 available for "standby use for mining, milling, and reclamation purposes, to supplement supply" from the production wells.

185.    LRG-4652-S-16

a.      LRG-4652-S-16 was drilled on October 31, 1975, with a capacity of 110 gpm. The 1984 declaration claimed 177 available for "standby use for mining, milling, and reclamation purposes, to supplement supply" from the production wells.

**The Open Pit and the Dolores Well**

186.    LRG-4652-S-17, the open pit

a.      LRG-4652-S-17 was declared separately as a point of diversion, not as a well, and with no associated drill rig or well casing. The1984 declaration estimated that 75 gpm could be removed, but no pump was installed. 120 [acre-feet per year] was declared available for "dust control" and "reclamation," but no information was included concerning the calculation of this amount.

187.    LRG-4654, the Dolores well

a.      LRG-4654 was drilled in 1932 for mining purposes and was used in that capacity from 1932 to 1934. The well was used intermittently for mining between 1932 and 1981.